El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
La Ley no crea el interés social, lo reconoce y delimita. La sociedad ci-vilizada impone ciertos compromi-sos entre la libertad individual y el interés social. En primer plano está el interés social en la seguridad general; el reclamo, el deseo o la exi-gencia de sentirse libre de aquellos actos y conducta que amenazan la *15 existencia misma de la sociedad. Cuando la sociedad desarrolla su economía nace el interés individual en asegurar lo adquirido y en la cer-teza de las transacciones, moderado por el interés general en el progreso, en la continuada mejoría y avance de la ingeniería social que es tutela del Estado. (Enfasis suplido.(1)
Nuestro País, y podríamos afirmar que el resto del mundo, vive momentos muy convulsos en el aspecto econó-mico y financiero. Parecería que las economías de los paí-ses del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse.
El 25 de septiembre de 2009, y en virtud de la Ley Núm. 7 de 9 de marzo de 2009, el gobierno de Puerto Rico anun-ció el despido de casi 17,000 empleados públicos. Lamenta-blemente, tales despidos se suman a los aproximadamente más de 120,000 empleados en la empresa privada que en los pasados tres años también han perdido sus empleos en nuestra Isla. De una u otra forma todos hemos sido afecta-dos por estas cesantías. Todos tenemos algún miembro de nuestra familia íntima, algún familiar cercano, algún buen amigo, algún compañero de trabajo o algún buen vecino que ha perdido su empleo durante estos tiempos tan difíciles.
Muy conscientes de esta dura realidad, nos confronta-mos con otra igualmente dura y antipática. Antipática por aparentar ser insensible o poco empática para con aquellos compañeros en el servicio público que sufren la pérdida de sus empleos. La realidad es que corresponde al Estado velar por el bienestar económico colectivo, a expensas del bienestar individual. Y la realidad es que le atañe a esta Curia —pues a los jueces no nos puede dominar el temor a *16 decidir— resolver finalmente si es constitucional o no, a la luz de un escrutinio racional y del balance de intereses, la ley que autoriza tales despidos.
I
Los recurridos(2) son empleados de carrera, algunos unionados, del Gobierno de Puerto Rico, a quienes se les anunció mediante carta que, el 6 de noviembre de 2009 o el 8 de enero de 2010, quedarían cesantes de sus puestos.(3) *17 Las cesantías de todos estos empleados se dan en virtud de la aprobación de la Ley Núm. 7 de 9 de marzo de 2009, Ley Especial Declarando Estado de Emergencia Fiscal y Esta-bleciendo Plan Integral de Estabilización Fiscal para Sal-var el Crédito de Puerto Rico (Ley Núm. 7).
Con la aprobación de la Ley Núm. 7, se creó la Junta de Reestructuración y Estabilización Fiscal de Puerto Rico (J.R.E.F.), para implantar, en toda su extensión, el referido Plan de Cesantías.(4) Como parte de la preparación del Plan de Cesantías, y conforme al estatuido criterio de an-tigüedad, se solicitó a cada empleado gubernamental —in-cluyendo a los aquí recurridos— que remitieran sus esta-tus de antigüedad a la agencia para la cual laboran, o sea, el número de años trabajados en el gobierno.(5) En vista de lo anterior, el 25 de septiembre de 2009, y como ya señala-mos, se les notificó a cada uno de los aquí recurridos que quedarían cesantes de sus puestos.
En las cartas de cesantías entregadas a cada uno de los recurridos se les informó, entre otras cosas, la razón de su despido. Además, se les notificó claramente de su derecho a solicitar revisión de la determinación de la agencia ante la *18 Comisión Apelativa del Sistema de Administración de Re-cursos Humanos (CASARH), o, en el caso de los empleados unionados, ante la Comisión de Relaciones del Trabajo del Servicio Público. Para la consecución de lo anterior los re-curridos tendrían un término de treinta días, contados a partir del recibo de la carta.
Una vez notificados de sus cesantías, los recurridos pre-sentaron ante el Tribunal de Primera Instancia demandas contra el Gobierno de Puerto Rico (Gobierno(6) solicitando un injunction preliminar y permanente, así como una soli-citud de sentencia declaratoria, en la que peticionaban, en-tre otras cosas, el que se declarara inconstitucional la Ley Núm. 7, y como consecuencia, se declararan nulas sus cesantías. (7) Así las cosas, en todos estos casos el Gobierno presentó, entre otras mociones, recursos de certificación. Habiendo considerado el asunto, expedimos los recursos, paralizando los procedimientos ante el Tribunal de Pri-mera Instancia, ordenando que se elevaran los autos y con-cediendo a las partes término para presentar sus alegatos. (8)
En el ínterin, y en el CT-2009-4, el 19 de octubre de 2009, los recurridos nos solicitaron, en auxilio de jurisdic-ción, que emitiéramos una orden provisional para parali-zar las cesantías decretadas por el Estado. El 26 de octubre *19 de 2009 emitimos una resolución en la que declaramos “no ha lugar” a tal solicitud.(9)

Planteamientos de las partes recurridas

En los recursos CT-2009-4 y CT-2009-5 los recurridos argumentan que tienen un derecho o interés propietario sobre sus puestos como empleados de carrera, el cual está protegido por el debido proceso de ley que emana, tanto de la Constitución del Estado Libre Asociado de Puerto Rico, como de la Constitución federal. Argumentan asimismo que ese debido proceso de ley ha sido afectado mediante la Ley Núm. 7, tanto en su aspecto sustantivo como procesal.
Señalan los recurridos en el CT-2009-4 que una cesantía es el último recurso a seguir, pudiéndose tomar otras me-didas como lo son reducir el horario de trabajo e, incluso, el salario de los empleados, y que dichas medidas no se tomaron. En otras palabras, reclaman que no se especifi-caron las razones económicas ni se presentó prueba sobre la necesidad imperiosa de despedir personal y no tomar otras medidas. Además, plantean los recurridos en el CT-2009-4 que la aplicación de la Ley Núm. 7 elimina retroac-tivamente derechos adquiridos por éstos, en contravención al Art. 3 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3.
Por otro lado, en ambos recursos (CT-2009-4 y CT-2009-5) los recurridos argumentan que la Ley Núm. 7 viola su debido proceso de ley al eximir del estricto acatamiento unos procesos anteriores a una cesantía, establecidos en la Ley Núm. 184,(10) como lo son: el que el plan de cesantías no fue publicado y que tampoco se publicaron listas de an-tigüedad por clasificación ocupacional. Además, éstos re- *20 claman que el Plan de Cesantías de la Ley Núm. 7 no sigue un debido proceso de ley en su implantación, al no ser pu-blicada la metodología ni las listas de antigüedad, ni pro-veérseles una vista previa a sus cesantías.
Por su parte, en el CT-2009-6 se nos argumenta, entre otros, que la notificación de cesantía fue contraria al Con-venio Colectivo suscrito entre las partes, de acuerdo con la Ley Núm. 45 de 25 de febrero de 1998, conocida como Ley de Relaciones del Trabajo para el Servicio Público, por lo que violenta el debido proceso de ley de los recurridos. Es-tos plantean que tienen un derecho propietario sobre su empleo y que la Ley Núm. 7 deja sin efecto dichos dere-chos, así como los negociados colectivamente, en menos-cabo de las obligaciones contractuales.
Finalmente, en el CT-2009-9 se reproducen esencial-mente los mismos planteamientos esbozados en los antedi-chos recursos. No obstante, la parte recurrida también se-ñala que el Art. 37.04(b)(5),(6) y (7) de la Ley Núm. 7, delega a la J.R.E.F. unos poderes sin guías claras que oca-sionan una concentración indebida de poderes en dicho organismo(11) Perfeccionados todos los casos aquí consoli-dados, procedemos a resolver.
HH 1 — i

Ley Núm. 7 de 9 de marzo de 2009

La Ley Núm. 7 es un extenso estatuto que establece un plan de tres fases para la reducción de los gastos *21 del Gobierno. (12) Entre estos gastos se incluyen los directa-mente relacionados con la nómina de los empleados públicos.(13) La reducción de los gastos de la nómina guber-namental se configura específicamente en el “Plan de Ce-santías” que se detalla en el Cap. Ill de la ley, titulado “Medidas de Reducción de Gastos”. A su vez, este plan de cesantías se rige por el criterio de antigüedad en el servicio público, esto es, deben ser cesanteados aquellos empleados con nombramiento de carrera o permanentes de menor an-tigüedad, independientemente de la agencia o dependencia en la que estén destacados.(14) La única excepción a la uti-lización de este criterio es para aquellos empleados que prestan servicios esenciales a la ciudadanía, y que son ne-cesarios para mantener la continuidad de estos servicios.
Del análisis de la Ley Núm. 7 se distinguen seis fines principales que ésta persigue: (1) el atender de manera integrada y responsable la crisis fiscal por la cual atraviesa el Gobierno de Puerto Rico; (2) proteger el crédito de Puerto Rico en conformidad con la See. 8 del Art. VI de la Constitución;(15) (3) proveer para un plan de estabiliza- *22 ción fiscal; (4) eliminar el déficit estructural en cumpli-miento con el mandato de la See. 7 del Art. VI de la Cons-titución;!(16) (5) devolverle al Gobierno su salud fiscal, y (6) establecer las bases para que el Gobierno pueda impulsar el desarrollo económico de Puerto Rico, mediante un plan integrado que consiste en Medidas de Ingresos y Mejor Fiscalización, Medidas de Reducción de Gastos y Medidas Financieras.
La Ley Núm. 7 es un estatuto de carácter económico (economic regulation) que conlleva un impacto socioeconómico, no sólo en el contexto de las cesantías que autoriza, sino además por las medidas de ingresos gubernamentales (recaudos para el fisco) y de fiscalización y reducción de gastos gubernamentales que impone.(17) Conviene entonces mencionar con algún detalle, lo que comprende este estatuto en sus partes más pertinentes.
Esta ley abarca cinco capítulos, algunos de ellos subdivididos a su vez en subcapítulos, en los que se establecen 72 artículos en total. El Cap. I establece las “Disposiciones Iniciales”, y consta de apenas tres artículos. El Art. 2 (Declaración de Propósito y Política Pública) específicamente declara un estado de emergencia económica y fiscal en el Gobierno, ante el cuadro económico y fiscal actual de la Isla. Como consecuencia de lo anterior, se esta- *23 blece como política pública del Gobierno “la necesidad apremiante de establecer un plan integrado y coherente de estabilización fiscal, la eliminación del déficit estructural, la amortización de la deuda pública, el restablecimiento de la salud fiscal y las bases para que el Gobierno pueda im-pulsar el desarrollo económico de Puerto Rico”. (Enfasis suplido. )(18)
El Art. 3 establece la primacía de esta ley por ser una ley especial, señalando a su vez que se aprueba por el ejercicio del poder de razón de Estado, así como por la facultad constitucional que tiene la Asamblea Legislativa, reconocida en las Secs. 18 y 19 del Art. II de nuestra Constitución(19) y al amparo de las Sees. 7 y 8 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, antes citadas.
El Cap. II consta de tres subcapítulos en el que se esta-blecen las “Medidas de Ingresos y Mejor Fiscalización”. En el Subcapítulo I se disponen las “Medidas Permanentes” y en el Subcapítulo II las “Medidas Temporales”. El Subcap. III se titula “Efecto en Otras Leyes” y dispone enmiendas a dos estatutos distintos relacionados con transferencias de fondos: una enmienda relacionada con la Universidad de *24 Puerto Rico y otra que se relaciona con transferencias de fondos municipales.
En el Cap. III, eje principal de la controversia que nos ocupa, se establecen las “Medidas de Reducción de Gastos”. En el Art. 33 de este capítulo se establecen las “Definiciones” que han de aplicarse al texto de la ley, en el que destacamos el Art. 33(g). Este artículo señala que el “Objetivo” de esta ley es el establecimiento de un plan de emergencia dirigido a reducir en dos mil millones de dólares los gastos operacionales y de nómina pagaderos del Fondo General para el año fiscal 2009-2010, luego de ex-cluir el servicio de la deuda, las asignaciones por fórmulas de la Universidad de Puerto Rico, la Rama Judicial y los Municipios, y las asignaciones a la Rama Legislativa, armonizado con el interés gubernamental de asegurar la calidad y la continuidad en el ofrecimiento de los servicios a la ciudadanía. El Art. 34 instituye la aplicabilidad de ésta.
Los Arts. 35 al 37 establecen lo que la Ley llama “Plan de Emergencia de Medidas de Reducción de Gastos”. Este plan está compuesto por tres fases, una de las cuales, la Fase II, entrará en vigor progresivamente, mientras no se alcance el Objetivo establecido como política pública en el Art. 33(g) de la Ley. El Art. 36 comprende la Fase I, en la cual se establece un “Programa Voluntario de Reducción Permanente de Jornada” y un “Programa de Renuncias Vo-luntarias Incentivadas”, disponible para los empleados ele-gibles en las agencias afectadas.(20)
*25 El Art. 36.04 (Certificación) reviste una importancia particular. Este artículo establece que al concluir el plazo de los 30 días para acogerse al Programa de Renuncias Voluntarias Incentivadas y al Programa de Reducción Per-manente de Jornada, las agencias tendrán un término no mayor de siete días para presentar a la OGP un informe indicando el monto de la economía lograda. Es a partir de la fecha en que vence la entrega de estos informes por parte de las distintas agencias, y en un término no mayor de diez días, que la OGP tiene que certificar a la J.R.E.F. y a los Presidentes de los Cuerpos Legislativos la economía proyectada como resultado de la implantación de la Fase I y la certificación de la economía proyectada del Art. 38.02, Fase III. Es basado en el análisis de esos resultados que la OGP tiene que anunciar si el objetivo se ha alcanzado y, de no ser así, recomendar poner en efecto la Fase II.
El Art. 37.01 establece que una vez la OGP emite la certificación (Art. 36.04) en la que se concluye que el obje-tivo establecido como política pública (Art. 2) no ha sido alcanzado, el plan de cesantías entrará en vigor. El Art. 37.02 enumera los empleados de las distintas agencias que, para evitar un impacto negativo en los servicios brin-dados por el Gobierno, están excluidos de la aplicación de la Fase II.(21) El Art. 37.03 señala que si la certificación por parte de la OGP concluye que no se alcanzó el objetivo *26 establecido en la Fase I, se pondrá en vigor inmediata-mente la Fase II.
Una vez se inicia la Fase II, el Art. 37.04 se torna de principal importancia. Este artículo establece los paráme-tros y el procedimiento a llevarse a cabo durante esa fase. Por ser de particular pertinencia a los planteamientos de los aquí recurridos, lo citaremos casi en su totalidad:

Artículo 37.04.-Procedimiento.

El procedimiento para llevar a cabo la Fase II será el dis-puesto en este Artículo.
(а) Suspensión Temporera. Con el comienzo inmediato de la Fase II, automáticamente se suspenderá toda cláusula, pre-cepto y/o disposición aplicable a los empleados y/o puestos su-jetos a las disposiciones de este Capítulo III, contenidas en leyes, convenios colectivos, acuerdos, acuerdos suplementa-rios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasifica-ción y/o planes de retribución, referentes a:ascensos, descen-sos, reubicaciones y/o traslados;
(1) retención y cesantía, que conflija con lo adoptado en esta Ley;
(2) reducción de fuerza laboral o cesantía, al igual que cual-quier otra disposición que requiera observar ciertas medidas necesarias previo a la implantación de cualquier reducción de fuerza laboral o cesantía;
(3) reingreso y de adopción de registro de elegibles;
(4) toda disposición que impida asignar tareas correspondien-tes a un grupo de empleados, clases de puestos, niveles, uni-dad sindical o unidad apropiada;
(5) toda disposición que impida la sub-contratación de tareas asignadas a un grupo de empleados, clases de puestos, niveles, unidad sindical o unidad apropiada;
(б) toda disposición que impida consolidar tareas en puestos, clases de puestos o niveles;
(7) disposiciones en cuanto a limitaciones de los derechos de gerencia o de administración de las Agencias; excepto en aque-llo que no esté en conflicto con este Capítulo III;
(8) disposiciones o cláusulas donde la Agencia se obligue a dar fiel cumplimiento a lo acordado o pactado, en cuanto a los aspectos que estén en conflicto con las disposiciones de este Capítulo III;
*27 (9) requisitos de utilizar antigüedad, en la medida en que las disposiciones de antigüedad sean contrarias a lo dispuesto en este Capítulo III o constituyan una limitación para efectuar cambios en funciones, ascensos, descensos, reubicaciones, traslados, destaques u otras transacciones necesarias para evitar que se afecten los servicios; y
(10) procedimientos de resolución de controversias, revisión y/o apelación que estén en conflicto con las disposiciones que, en cuanto a esas áreas, se proveen en este Capítulo III.
La suspensión de las cláusulas y disposiciones descritas en el inciso (a) de este Artículo será por un término de dos (2) años, pudiendo el Gobernador reducir este período mediante Orden Ejecutiva, de certificar la OGP que las economías resul-tantes de la implantación de los mecanismos provistos por este Artículo son suficientes para cubrir los objetivos.

(b) Cesantías.

(1) En vista del estado de emergencia fiscal, la escasez de recursos fiscales, la gravedad de los problemas que enfrenta-mos y la urgencia requerida para corregir los problemas fisca-les, se exime de agotar medidas tales como reubicación de personal, readiestramiento de empleados, disfrute de vacaciones acumuladas, disfrute de licencia sin sueldo, reducción de jor-nada de trabajo o descensos, previo a instrumentar las cesantías.
(2) Las Agencias notificarán la terminación a todo em-pleado que a la fecha de la vigencia de esta Ley tenga un nombramiento transitorio o irregular, por lo que no será nece-sario observar, en cuanto a éstos, el criterio de antigüedad. La notificación escrita que a esos efectos las Agencias envíen, le apercibirá al empleado de su derecho de solicitar revisión de la decisión de la Agencia, ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2008, y su reglamento. La notificación se hará mediante entrega a la mano o por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia.
(3) Las cesantías de los empleados con nombramiento per-manente o de carrera se efectuarán observando exclusiva-mente el criterio de antigüedad, de modo que sean cesan-teados en primer término aquellos que tengan menor antigüedad.
(4) Se crea la JREF, la cual estará compuesta por el Presi-dente del BGF, el cual dirigirá la Junta, el Secretario del Tra-bajo, el Secretario del Departamento de Desarrollo Económico *28 y Comercio de Puerto Rico, el Secretario del Departamento de Hacienda, y la Directora Ejecutiva de la OGP. Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que reciben por el desempeño de sus labores en sus agencias o departamentos.
(5) Además de las facultades otorgadas por este Capítulo III, la JREF tendrá todas las facultades necesarias y conve-nientes para descargar la encomienda aquí asignada, inclu-yendo pero sin limitarse a la de realizar o encomendar, a las agencias o departamentos que están a su cargo, que se reali-cen los estudios que sean necesarios; requerir a las Agencias la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Agencias en todo lo relativo a los em-pleados a ser cesanteados; evaluar, aprobar o rechazar peticio-nes de empleados para reducir la jornada de los puestos que ocupan; llevar a cabo reuniones entre sí y con los jefes de las Agencias; y reclutar de forma temporal, mediante destaque, el personal necesario para realizar la encomienda. Su Presidente tendrá la facultad, además, para asignar y/o poner a la dispo-sición de la JREF todo recurso del BGF que sea necesario para descargar sus obligaciones bajo este Capítulo III. La enco-mienda de la JREF, y su duración finalizará una vez se cum-pla el objetivo de la ley.
(6) La JREF habrá de determinar la cantidad global de em-pleados a ser cesanteados, en conformidad con las disposicio-nes del Artículo 2 de esta Ley y en armonía con la necesidad de asegurar la continuidad y calidad de los servicios guberna-mentales, dentro de un término no mayor de cinco (5) días calendario de iniciada la Fase II.
(7) Las Agencias identificarán y certificarán a la JREF la antigüedad de cada uno de sus empleados, dentro de un tér-mino no mayor de quince (15) días calendario de iniciada la Fase II.

En el mismo término, las Agencias certificarán por escrito a sus empleados afectados, individualmente, su fecha de anti-güedad según surge de sus récords. En el caso de empleados miembros de una unidad apropiada representada por una or-ganización sindical se notificará, además, a dicha organiza-ción sindical. Dicha certificación se notificará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias y apercibiéndole del derecho que tiene el empleado a exponer y fundamentar por escrito su versión en cuanto a su fecha de antigüedad. La fecha de notificación será la de su entrega o envío.

*29 (8) El empleado, y de ser el caso, éste a través de su organi-zación sindical, tendrá un término no mayor de treinta (30) días calendario, a partir de la fecha de la notificación, para presentar por escrito a la Agencia, evidencia documental ofi-cial emitida por la autoridad o entidad gubernamental compe-tente (“evidencia documental fehaciente”) que refute la antigüe-dad que le ha sido certificada. Para ello utilizará el formulario que para esos fines será provisto por su respectiva Agencia, el cual completará y someterá a su propia Agencia, con copia de la evidencia documental fehaciente que refute la fecha de an-tigüedad notificada por la Agencia.
(9) En la eventualidad de que el empleado afectado no refute o no presente, dentro del término aquí dispuesto, eviden-cia documental fehaciente que sostenga su posición, la anti-güedad a ser utilizada será aquella que le fue notificada por la Agencia. Dicha antigüedad será concluyente para todo propó-sito relacionado con este Capítulo III.
(10) En la eventualidad de que el empleado afectado pre-sente, dentro del término aquí dispuesto, evidencia documental fehaciente que controvierta la antigüedad que le ha sido noti-ficada, la Agencia no tomará determinación final sobre la an-tigüedad sin antes darle la oportunidad de tener una vista previa.
(11) La Agencia notificará al empleado su determinación final que sobre la antigüedad tome, y, además, de ser el caso, a la organización sindical, en un término no mayor de treinta (30) días calendario, apercibiéndole de su derecho de solicitar revisión de dicha determinación, conforme a lo dispuesto a esos fines en el inciso incisos (13) y (14), del Artículo 37.04(b) de esta Ley. Dicha notificación se hará a los empleados, y, ade-más, de ser el caso, a la organización sindical, mediante en-trega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias. La fecha de notificación será la de su entrega o envío. No obs-tante, la presentación del recurso de revisión no habrá de pa-ralizar las cesantías; disponiéndose, no obstante, que en el caso que el empleado prevalezca, se le restituirá a su puesto, efectivo a la fecha de su cesantía.
(12) El empleado afectado podrá solicitar revisión de la de-terminación final tomada por la Agencia, solamente en cuanto a su antigüedad ante la CASARH, en conformidad a lo dis-puesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2004, y su reglamento.
(13) Aquellos empleados que sean miembros de una unidad apropiada, afiliados o no a una organización sindical, podrán *30 revisar la determinación tomada final por la Agencia, sola-mente en cnanto a su antigüedad, mediante una petición que a esos efectos presenten a los árbitros de la Comisión, creada al amparo de la Ley Núm. 45 del 25 de febrero de 1998, en un término no mayor de treinta (30) días calendario del recibo de la notificación de la Agencia.
(14) La Agencia notificará las cesantías con al menos treinta (30) días calendario de anticipación a la fecha de su efectividad, mediante comunicación escrita dirigida al em-pleado y, además, de ser el caso, a la organización sindical, indicando la fecha de efectividad de la misma. La notificación se realizará conforme al Artículo 37.04(b), inciso (12) de este Capítulo III. (Enfasis suplido.)
Por otra parte, el Art. 37.05 instaura los beneficios que recibirán los empleados cesanteados.(22) El Art. 37.06 dis-pone que al concluir la Fase II las agencias deberán pre-sentar a la OGP un informe, que refleje las economías lo-gradas por las cesantías realizadas. Con esa información,
la OGP certificará a la J.R.E.F. y a los Presidentes de los Cuerpos Legislativos, la economía proyectada como resul-tado de la implantación de la Fase II, indicando, además, sus conclusiones en cuanto a si el objetivo se alcanzó. La OGP y el Departamento de Hacienda someterán a los Pre-sidentes de los Cuerpos Legislativos un informe conjunto cada noventa (90) días sobre el progreso de los recaudos y la reducción de gastos como el resultado de la implantación de la Fase II.
Con el Art. 38 se establece la Fase III, la que entró en vigor inmediatamente advino vigente la ley (Art. 38.01). *31 La Fase III establece un plan de suspensión temporera, por el término de dos años (Art. 38.02(b)), de leyes, convenios colectivos, preceptos y acuerdos, así como de toda cláusula, precepto o disposición contenidas en leyes, convenios colecti-vos, acuerdos, acuerdos suplementarios, políticas, manuales de empleo, cartas circulares, cartas contractuales, addenda, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o planes de retri-bución, aplicable a los empleados sujetos a lo establecido en el Capítulo III de la propia Ley, y referentes a veintisiete aspectos que se enumeran en el propio artículo.
Además, este Art. 38 suspende la eficacia de toda disposición reglamentaria, o contenida en documentos tales como políticas, certificaciones, circulares, adenda, reglas y condiciones de empleo o por manuales de empleo, de cualquier índole, que provea para una licencia con paga, que no sea una establecida estatutariamente. El Art. 39 establece el Programa de Alternativas para Empleados Públicos. Este programa consiste en proveerle al empleado cesanteado al amparo del Art. 37, como beneficio adicional y con preeminencia, el que pueda escoger una de tres alternativas. (23)
El Art. 40 (“Negociación de convenios vencidos”) señala que los convenios colectivos expirados a la fecha de vigencia de la ley o que expiren durante la vigencia de ésta, no podrán ser extendidos ni negociados. Esta prohibición se extenderá por un término de dos años, a partir de la vigencia de la propia ley.
*32 El Art. 41 (“Traslados”) establece que
[djurante las Fases I, II y III, y con el fin de asegurar la continuidad y calidad de los servicios gubernamentales, la JREF podrá autorizar traslados de empleados entre puestos, clases y niveles de puestos, grupos de empleados, unidades apropiadas; traslados de unidades sindicales a no sindicales y viceversa, en una misma Agencia o entre Agencias; disponién-dose, que el empleado trasladado deberá cumplir con los re-quisitos mínimos de preparación académica y experiencia ne-cesaria para ocupar el puesto. El empleado trasladado estará sujeto al período probatorio requerido para el puesto. [Además q]uedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio, acuerdo o precepto que sea contrario a lo indicado en el Capí-tulo III; disponiéndose, que existirá total flexibilidad para rea-lizar los traslados.
El Art. 42 (“Subcontratación”) establece que
[d]urante las Fases I, II y III, ... y [nuevamente] con el fin de asegurar la continuidad y calidad de los servicios guberna-mentales, la JREF podrá autorizar la transferencia y subcon-tratación de labores realizadas por empleados, unidades apro-piadas o unidades sindicales, ... quedando en suspenso, durante la vigencia de las tres fases, toda aquella disposición de ley, reglamento, convenio o precepto contrario a lo indicado [en el Capítulo III de la ley].
También se dispone que en
[t]odo contrato otorgado por las Agencias conforme a ese [Art. 42], se le requerirá al contratista que, en la prestación de los servicios contratados, emplee empleados cesanteados disponi-bles, que tengan la preparación y experiencia necesaria para prestar el servicio contratado, conforme a la lista de candida-tos a reempleo que habrá de preparar la [Oficina de Recursos Humanos del Estado Libre Asociado] (ORHELA) a tenor con lo dispuesto en el Artículo 43 [del] Capítulo III.
El Art. 43 (“Normas de reingreso y de contratación de empleados cesanteados”) implanta un registro de elegibili- *33 dad por el término de un año, de empleados cesanteados. Este registro deberá ser preparado por ORHELA.(24)
En el Art. 44 (“Prácticas Ilícitas”) se dispone que
[l]a adopción de cualquier medida autorizada [por el] Capítulo III, ya sea por la JREF, OGP, el BGF, la ORHELA, las Agen-cias, sus Autoridades Nominadoras, el Gobernador o por cual-quiera de los representantes de éstos, no constituirá una vio-lación a los convenios colectivos[, ni una práctica ilícita].
En el Art. 46 (“Interés público y foro para dirimir controversias”) se establece la importancia de los asuntos contenidos en la Ley, por estar revestidos de un gran interés público. A la vez, se resalta la importancia de velar por los derechos de los empleados afectados, en cuanto a las acciones por tomarse conforme a lo dispuesto en el Capítulo III. En ese contexto, el artículo dispone que CASARH tendrá jurisdicción para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme al Capítulo III, en todo aquello que no conflija con éste, de aquellos empleados no cubiertos por las disposiciones de la Ley de Relaciones del Trabajo para Servicio Público, Ley Núm. 45 de 25 de febrero de 1998, según enmendada (Ley Núm. 45).
CASARH tendrá, asimismo, jurisdicción apelativa vo-luntaria sobre los empleados no organizados sindicalmente de aquellas agencias excluidas de la aplicación de las dis-posiciones de la Ley para la Administración de los Recur-sos Humanos en el Servicio Público del Estado Libre Aso-ciado de Puerto Rico de 2004 (Ley Núm. 184), en cuanto a apelaciones surgidas como consecuencia de acciones o de-cisiones tomadas conforme al Capítulo III, en todo aquello *34 que no conflija con este último. También dispone que la Comisión de Relaciones del Trabajo del Servicio Público (Comisión) mantendrá jurisdicción para ventilar cargos de práctica ilícita y prestar servicios de arbitraje, en cuanto a acciones o decisiones cubiertas por la Ley Núm. 45, según enmendada, en armonía con las disposiciones de la Ley Núm. 7.
Finalmente, ante la posibilidad de un aumento en la cantidad de reclamaciones presentadas en la Comisión, y para asegurar un debido proceso de ley y una solución justa y rápida en los procedimientos ante dichos organis-mos, este Art. 46 aumenta la composición de la Comisión a un Presidente y cinco miembros asociados, y autoriza al Presidente de la Comisión nombrar a los árbitros que sean necesarios para que realicen las labores encomendadas por el Capítulo III de la ley. Asimismo, se autoriza al Presi-dente de CASARH a nombrar y designar los Oficiales Exa-minadores que sean necesarios. Los Arts. 47 al 67 configu-ran las “Medidas Financieras” (Cap. IV) y del Art. 68 al 72 se establecen la “Disposiciones Finales” (Cap. V).
i — i HH h — I
La Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico establece, en lo que nos es pertinente, que
[njinguna persona será privada de su libertad o propiedad sin [el] debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. (Énfasis suplido.)(25)
Por su parte, la Quinta Enmienda de la Constitución de Estados Unidos, en lo pertinente, señala: "... nor [shall any *35 person] be deprived of life, liberty, or property, without due process of law.” (Enfasis suplido.(26)
A su vez, la Enmienda Catorce de la Constitución de Estados Unidos reza:
... nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.(27)
Como se aprecia, tanto nuestra Constitución como la Constitución federal, reconocen como derecho fundamental el debido proceso de ley. El debido proceso de ley se manifiesta en dos dimensiones: la sustantiva y la procesal. (28) Analizaremos ambas doctrinas en el contexto de los reclamos esbozados por las partes recurridas.
Todos los recurridos en los casos aquí consolidados re-claman tener, como empleados públicos de carrera, un in-terés propietario sobre sus plazas. Les asiste la razón. Desde Lupiáñez v. Srio. de Instrucción, 105 D.P.R. 696 (1977), reconocimos por primera vez tal derecho, en esa ocasión basándonos en una expectativa legítima de que un puesto se convertiría en permanente. Un año después, en Pierson Muller I v. Feijoó, 106 D.P.R. 838 (1978), reconoci-mos expresamente tal derecho a los empleados públicos de carrera, como lo son los aquí recurridos. Ese derecho pro-pietario garantiza, al ser afectado por una acción del Es-tado (“State Action”), la concurrencia de un debido proceso de ley.(29)
Por otro lado, y como señala el siempre apreciado Prof. Miguel Velázquez Rivera, “la jurisprudencia constante del Tribunal Supremo de Estados Unidos y del de Puerto Rico es clara en el sentido de que el ejercicio del derecho de propiedad no es absoluto. Está supeditado a intereses so- *36 cíales que se agrupan en el concepto de ‘poder de razón de estado’ o ‘police power’ ”.(30)
A. Doctrina de Poder de Razón de Estado (“Police Power”)
“[T]oda comunidad políticamente organizada tiene lo que hemos llamado el poder público del estado (“police power”) para salvaguardar la seguridad, la salud y el bienestar de sus habitantes.”(31) Desde principios del siglo pasado hemos interpretado las implicaciones que conlleva este poder de razón de Estado. Desde entonces, también hemos reconocido la dificultad que entraña una “definición satisfactoria” de tal concepto.(32) No obstante, y por la presente opinión, adoptamos la siguiente como definición de “poder de razón de estado”, por ser una que precisa el concepto de manera práctica, sencilla y muy pertinente a la controversia que nos ocupa:
Aquel poder inherente al Estado que es utilizado por la Legis-latura para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios.(33) (Enfasis suplido.)
Ahora bien, como señala el profesor Serrano Geyls:
El Tribunal [Supremo Federal] se ha negado consecuente-mente a ofrecer una definición exacta de las fronteras del po-der de reglamentación [“police power”]. Ha preferido, al en-frentarse a objeciones constitucionales a su uso, resolver cada caso conforme con sus hechos. Originalmente ese poder com-prendía la facultad de dictar reglas para proteger la salud, la seguridad y la moral públicas, según las tradiciones del “com *37 mon law”. Luego,} se le añadió la frase, aún más amplia, de “bienestar general”. Ha mantenido ese significado hasta el presente. (Citas omitidas y énfasis suplido.(34)
En ese contexto, ya hemos pautado que el poder de razón de Estado es uno amplio. Por eso, al tratar de delimitar su marco de injerencia debe hacerse de acuerdo a las circunstancias y hechos particulares de cada caso.(35) Entre esas circunstancias, hemos reconocido la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado.(36)
Además, en el pasado hemos reconocido incluso “la estética” como un fundamento único y válido para el ejercicio por la Rama Legislativa del poder de razón de Estado, específicamente en la consecución del bienestar general.(37) De hecho, desde principios del siglo pasado el Tribunal Supremo federal ha reconocido que, bajo este poder, se pueda hasta limitar en determinadas circunstancias el número de personas que pueden ocupar una vivienda y la relación entre éstas.(38) Y es que, en el ejercicio de su poder de razón de Estado, la Legislatura “goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad. La única limitación que tiene es la dispuesta por la garantía del debido proceso de ley”.(39)
*38 B. Debido Proceso de Ley Sustantivo
La controversia con relación a la constitucionalidad de la Ley Núm. 7, en el contexto de las cesantías que autoriza, así como la eliminación de unos procesos anteriores a esas cesantías —establecidos mediante la Ley Núm. 184— es una estrictamente de debido proceso de ley sustantivo. Por otro lado, la ausencia o inadecuacidad —si ese fuera el ca-so— de otro proceso que sustituya el dejado sin efecto por la Ley Núm. 7, es un asunto de debido proceso de ley en su aspecto procesal. Conviene entonces revisitar ambas doc-trinas, en especial lo relacionado al debido proceso de ley sustantivo y su estrecha relación con lo concerniente a la reglamentación del tipo económico.
“El término debido proceso de ley conlleva una connotación exclusivamente procesal. No obstante, por mucho tiempo se ha aceptado que una ley o actuación gubernamental puede violar el debido proceso de ley por su contenido o consecuencia, independientemente del proceso utilizado para aplicarlas”.(40) Para entender con corrección el concepto “derecho procesal sustantivo” y su relación con la reglamentación de tipo económico, conviene considerar su trasfondo en la historia de Estados Unidos de América. El profesor Serrano Geyls nos señala lo siguiente:
Los años que siguieron a la aprobación de la Enmienda XIV hasta 1934 se distinguieron por tres desarrollos fundamenta-les: ... el acelerado crecimiento del capitalismo norteameri-cano con su secuela de abusos contra individuos y grupos eco-nómicamente débiles; ... la intervención en las actividades económicas, gradualmente más acentuada, de los gobiernos de los estados y luego del gobierno federal para eliminar o reducir esos abusos; y ... el uso frecuente por los tribunales de una doctrina constitucional que limitó extensamente el poder de reglamentación económica de esos gobiernos.
*39 En los Slaughter-House Cases, 83 U.S. 36 (187[2]), el Tribunal Supremo rechazó (5-4) la idea ... de que la cláusula de privilegios e inmunidades de la ciudadanía contenida en la Enmienda XIV incluye los derechos comprendidos en las pri-meras diez enmiendas. Se trataba de una ley de Louisiana que concedía el monopolio de la matanza de ganado en New Orleans a una corporación. Los demandantes alegaron también que la ley violaba el debido proceso de ley. ...
Correspondió al Juez Bradley ... discutir, en su opinión disidente, el debido proceso. Dijo que “los derechos a la vida, la libertad y la propiedad son derechos fundamentales de los que solo puede disponerse mediante el debido proceso de ley”.
Así hizo su aparición, en la jurisprudencia del Tribunal Supremo federal ... el concepto de debido proceso de ley “sustan-tivo” como freno a la reglamentación económica. Expresiones aisladas incluidas en opiniones del Tribunal confirmaron la gradual aceptación de la doctrina. ...
Luego en Holden v. Hardy ... se sostuvo la validez de una ley estatal que limitaba a ocho horas la jornada de trabajo de los empleados de minas y fundiciones, porque constituía un ejercicio “razonable” del poder legislativo en vista de las insa-lubres condiciones de trabajo imperantes en la industria ... Unos años después, entró Lochner v. New York ... [y] se pro-dujo la consagración definitiva del debido proceso de ley sus-tantivo, a la vez que un intenso debate sobre sus alcances.
De 1905 a 1934 [iniciando con Lochner en 1905] el Tribunal Supremo invalidó unas [200] leyes de reglamentación econó-mica, federales y estatales, fundamentándose mayormente en el debido proceso de ley sustantivo. Un número mayor fue aprobado. ...
La gravísima situación económica que aquejó a los Estados Unidos de 1930-1933 ... los justos reclamos de los individuos y grupos más perjudicados por ella, la simpatía de los gobiernos hacia esos reclamos y las críticas dentro y fuera del Tribunal a las aplicaciones del debido proceso sustantivo provocaron un cambio de interpretación. Nebbia v. New York, 291 U.S. 502 (1934) constituyó el primer paso.
Nebbia, un pequeño tendero [pequeño comerciante], fue con-denado por violar una ley de New York que autorizaba fijar precios mínimos y máximos a la leche. Alegó que la ley violaba *40 el debido proceso y la igual protección garantizados por la En-mienda XIV. El Tribunal sostuvo la validez de la ley por vota-ción 5-4. ...
West Coast Hotel v. Parrish ... marca la aceptación defini-tiva de una nueva aplicación del debido proceso de ley sustan-tivo a la reglamentación económica. La jurisprudencia del Tribunal Supremo hasta nuestros tiempos ha reafirmado, en términos aún más enfáticos, esa nueva posición. (Citas omitidas.(41)
Como señala el profesor Serrano Geyls, “la consagración definitiva del debido proceso de ley sustantivo” adviene con el caso de Lochner v. New York, 198 U.S. 45 (1905). Lochner y su progenie marcan un periodo en el que se presumía la inconstitucionalidad de cualquier ley que intentara regular la propiedad privada, obligando al Estado a probar que la legislación mantenía algún tipo de relación razonable con un fin legítimo. Sin embargo, este criterio judicial no se sostuvo por mucho tiempo. El ocaso de la llamada “era Lochner” inició con el caso Nebbia v. New York, 291 U.S. 502 (1934). Es a partir de ese momento que ese control estricto que Lochner impuso sobre la legislación económica comenzó a deteriorarse, encontrando su final a partir de 1937, con el caso West Coast Hotel Co. v. Parrish, supra. En West Cost el Tribunal Supremo Federal *41 sostuvo la validez de una ley del Estado de Washington que establecía un salario mínimo para las mujeres, revo-cando así la decisión Adkin v. Children’s Hospital, 261 U.S. 525 (1923), que había declarado inconstitucional una legis-lación que establecía exactamente lo mismo, por constituir un menoscabo a las obligaciones contractuales. De hecho, desde West Coast Hotel Co. v. Parrish, supra, práctica-mente toda revisión judicial en casos relacionados con el “Police Power” del Estado según la Emda. XIV de la Cons-titución federal se han efectuado al amparo de las cláusu-las del debido proceso de ley y la de igual protección de las leyes. Cuando una ley regula un derecho o una libertad que afecta a la ciudadanía en general por igual, se la so-mete al escrutinio del debido proceso de ley sustantivo; cuando la ley establece clasificaciones que regulan el ejer-cicio de un determinado derecho o libertad de un modo distinto a diversos grupos o personas, entonces se aplica el escrutinio (“test”) de la igual protección de las leyes.

Desarrollo en Puerto Rico

En cuanto al desarrollo histórico de la doctrina del de-bido proceso de ley sustantivo en nuestra Isla, citamos gran parte de lo expuesto por el profesor Alvarez González en su reciente obra:
El Tribunal Supremo de Puerto Rico se confrontó por pri-mera vez con la aplicación de Lochner v. New York ... en Pueblo v. García & García .... Se acusó a una empresa de violar el art. 553 del Código Penal de 1902 por haber tenido abierto al público su establecimiento de provisiones a las ocho y cuarto de la noche. Ambas partes presentaron alegatos sobre la apli-cación de Lochner a aquella situación.
El Tribunal en García se negó a aplicar a Lochner, tras diferenciar los hechos de ambos casos. Concluyó que el estatuto de Nueva York impugnado en Lochner establecía un límite al número de horas que un obrero podía trabajar, mientras que el art. 553 establecía una hora límite para cerrar establecimien-tos comerciales, las seis de la tarde. Ajuicio del Tribunal, el art. 553 no imponía un límite al total de horas de trabajo que *42 un obrero podía contratar, por lo que la situación era distin-guible de la de Lochner.
Lo curioso de García no es tanto la forma en que evadió aplicar a Lochner, sino que el Tribunal dio señas de inclinarse hacia la posición contraria a ese caso, a pesar de que en efecto estaba interpretando la Constitución federal, en la que la en-tidad acusada basaba su defensa. El Tribunal enfatizó su de-ber de sostener la constitucionalidad de una ley a menos que resulte claramente lo contrario y mostró renuencia a escudri-ñar el interés o propósito legislativo:
“[L]as cortes no investigarán respecto a las razones que los legisladores hayan podido tener en cuenta al aprobar dichas reglamentaciones siempre que las reglamentaciones mismas no sean contrarias a la razón.”
Acto seguido, el Tribunal adoptó un escrutinio de razonabi-lidad para adjudicar la validez constitucional de la Ley de Cierre. Resolvió que el que una reglamentación pueda erigir un obstáculo al libre comercio sólo provocará su invalidación cuando no se pueda encontrar razón alguna que la justifique. En la última oración de su opinión, el Tribunal utilizó una técnica que el Tribunal Supremo federal no vino a popularizar sino hasta después del desplome del edificio Lochner: conjetu-rar sobre el propósito legislativo y sobre el cuadro de hechos que el legislador tuvo ante sí.
No obstante, unos años después el Tribunal, que ahora in-terpretaba la cláusula de debido proceso de ley de la Ley Jones, se sintió obligado por la jurisprudencia federal e invalidó una ley que autorizaba a los municipios a crear monopolios para la venta de carne, desplazando así a los carniceros del ejercicio de su oficio, Pueblo v. Correa ... e invalidó también la ley de salario mínimo, Pueblo v. Laurnaga & Co., Sucs., S en C
En 1937, el mismo año en que se decidió West Coast Hotel Co. v. Parish ... surgió en Puerto Rico M. Taboada & Co. v. Rivera Martínez, Comisionado (1937). Este caso presentó una segunda oportunidad al Tribunal para expresarse sobre el tipo de escrutinio a usarse ante un ataque a la validez constitucio-nal de una medida de reglamentación económica. En Taboada se pidió al Tribunal que invalidara la Ley 49 de 1935, que regulaba las horas de trabajo de los empleados de estableci-mientos comerciales e industriales. Esa era una controversia muy similar a la de Lochner, por lo que el Tribunal no pudo evadir discutir a fondo ese caso, cuya fuerza como precedente ya estaba declinando rápidamente para 1937. El Tribunal re-sumió la posición de los jueces en Lochner y concluyó que la *43 minoría postulaba el principio correcto. Añadió que en Bunting v. Oregon, (1917), el Tribunal Supremo federal así lo re-conoció implícitamente, al negarse a indagar sobre el motivo legislativo de una reglamentación económica. Por ello, con-cluyó, Bunting revocó sub silentio a Lochner. ...
En 1940, García v. Municipio de Humacao, (1940) planteó de nuevo la validez de la Ley de Cierre, según enmendada en 1917 y 1925. Esas enmiendas autorizaron a los municipios a aplicar esa ley a las farmacias. El Tribunal reafirmó a García & García y sostuvo expresamente que la opinión del Juez Holmes en Lochner se había convertido en la norma imperante.
Desde entonces el Tribunal ha pasado ligeramente sobre so-licitudes para que indague sobre la motivación legislativa y la constitucionalidad de medidas de reglamentación económica. En casos como Montaner v. Comisión Industrial... (1940); Hilton Hotels v. Junta de Salario Mínimo ... (1953); A Roig, Sucr. v. Junta Azucarera ... (1954), expresó que no es su función enjuiciar la sabiduría o conveniencia política de una ley, sino sólo si ésta es irrazonable, arbitraria o caprichosa, que es lo único que exige el debido proceso [de ley], (Citas omitidas.(42)
Como bien señala el profesor Alvarez González, desde 1915, en El Pueblo v. García & García, 22 D.P.R. 817 (1915), adoptamos un escrutinio de razonabilidad (nexo ra-cional) con relación a los ataques a medidas de reglamen-tación socioeconómicas, según la cláusula de debido pro-ceso de ley en su modalidad sustantiva. Esto, incluso y como refleja el caso de El Pueblo v. García & García, supra, aim antes de que el Tribunal Supremo federal abra-zara tal criterio.
Desde entonces, y a través de todo el siglo pasado, sos-tuvimos la validez de múltiples leyes de reglamentación socioeconómica apoyados en el criterio de razonabilidad. Así por ejemplo, en Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 80 (1983), señalamos que la Legisla-tura, en el ejercicio de su poder de razón de Estado, tiene amplia facultad para la reglamentación de carácter econó-mico, sujeta únicamente a las limitaciones impuestas por *44 la garantía del debido proceso de ley. Señalamos específi-camente que “[e]stas limitaciones solo requieren que la re-glamentación no sea irrazonable, arbitraria o caprichosa y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue”(43)
Diez años después de Marina Ind., Inc. v. Brown Bovery Corp., supra, y por voz de la Juez Asociada Naveira, emitimos dos opiniones con algunas pautas que es menester citar. En Defendini Collazo et al. v. E.L.A., Cotto, 134 D.P.R. 28, 74 (1993), reiteramos que el debido proceso de ley sustantivo impide el que una persona sea privada arbitrariamente de un interés de libertad o propiedad. No obstante, también señalamos que “[u\na ley no será declarada inconstitucional por violar esta disposición siempre que la misma tenga una relación real y sustancial con el interés estatal que persigue” y cumpla con los requisitos de razonabilidad y no arbitrariedad o capricho legislativo. Allí, citando expresamente a Morales v. Lizarribar, 100 D.P.R. 717 (1972), reiteramos que
[l]os tribunales al examinar una controversia relativa a esta garantía constitucional “no entrarán en consideraciones sobre la sabiduría de las medidas legislativas, sino que sostendrán su constitucionalidad a menos que no tengan un propósito pú-blico legítimo, o sean claramente arbitrarias, o que no guarden una relación razonable con el propósito público que persiguen”. (Énfasis suplido.(44)
Como puede observarse, la garantía del debido proceso de ley exige que un estatuto de naturaleza socioeconómica no sea irrazonable, arbitrario, caprichoso y que el medio elegido tenga una relación racional con el *45 interés que se persigue.(45) Es decir, para determinar la constitucionalidad de una ley de carácter económico, bajo el crisol del debido proceso de ley sustantivo, es de aplica-ción un escrutinio de razonabilidad.(46) Este análisis es esencialmente similar al de la igual protección de las leyes mediante el escrutinio de nexo racional.(47)
Por último, en San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405, 431 (1993), señalamos que al utilizar el escru-tinio de nexo racional “el tribunal tiene que adoptar una actitud de gran deferencia hacia la actuación legislativa que se impugna. El fundamento de esta norma de deferen-cia reside en el principio constitucional de separación de poderes”. (Enfasis suplido.)(48) Por esta razón, el estatuto o reglamento, según sea el caso, se presume constitucional y el peso de la prueba recae sobre quien cuestiona su validez.(49)

En conclusión, es evidente que con relación a re-clamos al amparo de la cláusula de debido proceso de ley en su modalidad sustantiva, y en lo relativo a medidas de corte socioeconómico, este Tribunal ha seguido, hasta el día de hoy, la pauta establecida por el Tribunal Supremo federal de escrutinio o nexo racional; no vemos razón por la cual debemos apartarnos de ésta ahora.

C. Debido proceso de ley en su aspecto procesal
El “debido proceso de ley” es uno, pero lo es en virtud de sus circunstancias. En el aspecto procesal y en su sentido literal significa “un proceso justo”. Por eso señalamos que *46 es sólo uno, sin más acepciones; porque se trata llana-mente de un proceso que emane justicia, aunque no todos advirtamos la justicia de la misma manera.
El filósofo y el moralista ven la justicia abstracta. El hombre, sea abogado, sea político, ha tratado de identificarla con el interés individual de su propia clase, de su propia nación. Para el jurista la justicia es una realidad concreta. Es la sín-tesis de la vida real. Es una entidad heterogénea compuesta, como el hombre, de materia y espíritu, de oportunidad y de moral, que no se excluyen, sino que se equilibran, de razón y utilidad, de pasado y futuro, de tradición y renovación, que coexisten al igual que en la máquina coexisten freno y motor.(50) (Énfasis omitido.)
Como hemos señalado, “[e]l debido proceso de ley es una de esas fórmulas elásticas de justicia sustancial que no es susceptible de definición genérica. No es una norma invariable que pueda aplicarse por su propia virtualidad independientemente de las circunstancias que medien el caso”.(51)
Al considerar la doctrina del debido proceso de ley en su aspecto procesal, es necesario confirmar, en primer lugar, la existencia de un interés de libertad o propiedad protegido por esta cláusula constitucional y que este interés se encuentre afectado por una acción del Estado (“State Action”). En segundo lugar, es menester determinar las características mínimas que debe reunir el procedimiento mediante el cual el Estado pretende afectar negativamente ese derecho constitucionalmente protegido.
Como ya señalamos, desde Pierson Muller I v. Feijoó, supra, este Tribunal reconoció que los empleados de ca-rrera como los aquí recurridos ostentan un claro interés propietario que, como tal, se encuentra protegido por la Constitución puertorriqueña, así como por la de Estados *47 Unidos de América. También hemos señalado que tal pro-tección se circunscribe a que el derecho propietario en cuestión no pueda ser afectado por el Estado sin que a los recurridos se les garantice un debido proceso de ley.
En cuanto al procedimiento o proceso debido que se le debe conceder a un empleado de carrera cuando se le priva de su empleo, en Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881, 888 (1993), señalamos que “\d\ependiendo de las circunstancias, diversas situaciones pueden requerir diferentes tipos de procedimientos, pero siempre persiste el requisito general de que el proceso gubernamental debe ser justo e imparcial”. (Enfasis suplido y en original.) A renglón seguido pautamos, siguiendo la norma establecida por el Tribunal Supremo federal en Mathews v. Eldridge, 424 U.S. 319 (1976), que
... el Tribunal Supremo de Estados Unidos estableció los tres (3) criterios que deben sopesarse al determinar cuál es el pro-ceso debido para privarle a un individuo de algún derecho protegido. Estos son: (1) se debe determinar cuáles son los intereses individuales afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas, y (3) el interés gubernamental protegido con la acción sumaria y la posibili-dad de usar métodos alternos. (Enfasis omitido.) Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, pág. 888.
Asimismo, a la luz de los criterios enunciados en Mathews v. Eldridge, supra, y la jurisprudencia subsiguiente, se han establecido diversos requisitos con los que debe cumplir todo procedimiento adversativo para satisfacer las exigencias mínimas de un debido proceso procesal, a saber:
(1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído[; (4) derecho a contrain-terrogar testigos y examinar evidencia presentada en su contra]; (5) tener asistencia de abogado, y (6) que la decisión se base en el récord. Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, pág. 889.
*48 En Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 (1987), anotamos que la decisión final debe ser explicada o fundamentada. Es a la luz de estos parámetros que debe-mos resolver, sujeto a las circunstancias de estos casos en particular, los reclamos de los recurridos en cuanto al as-pecto procesal del debido proceso de ley.
Por otra parte, en Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716, 730-731 (1982) —un caso relacionado al área de empleo público— señalamos que los factores reconocidos por el Tribunal Supremo federal en Mathews v. Eldridge, supra, son los que se deben considerar para determinar si como requisito mínimo del debido proceso de ley, el empleado público tiene derecho a una vista informal previa a su despido.(52) A la luz de tales requisitos, este Tribunal ha resuelto que el debido proceso de ley, en su modalidad procesal, les garantiza a los trabajadores gubernamentales una vista informal previa al despido, cuando éstos demuestran tener un interés propietario reconocido por el Estado.(53)
IV
A. El estado de “emergencia fiscal”
La Ley Núm. 7 declara reiteradamente un “estado de emergencia fiscal” en Puerto Rico.(54) Esta constituye la pri-mera vez en la historia que nuestra Asamblea Legislativa *49 utiliza el término “estado de emergencia”, en el contexto de una situación económica a nivel de todo el País.(55) Ahora bien, ya antes este Tribunal ha reconocido la posibilidad de que, en circunstancias de emergencias relacionadas con as- *50 pedos económicos, la Asamblea Legislativa puede hacer uso de sus amplios poderes.(56) De hecho, en el pasado he-mos llegado a tomar conocimiento judicial de “la precaria situación económica del país”, y de cómo esa situación eco-nómica se refleja, produciendo una “grave crisis” en las fi-nanzas del Gobierno.(57)
Esta declaración de “estado de emergencia fiscal” que enuncia la Ley Núm. 7 se emite como consecuencia, a su vez, de la determinación de la existencia de una “grave emergencia fiscal” que justifica —según el texto de la pro-pia Ley— el uso del “poder de razón de Estado” por parte de la Asamblea Legislativa. Corresponde entonces exami-nar cuáles son las circunstancias que motivan a la Asam-blea Legislativa para declarar un estado de emergencia fiscal, invocando de esta forma su amplio poder de razón de Estado y, mediante éste, aprobar una medida que afecta los intereses propietarios de los aquí recurridos.
B. La situación fiscal del Gobierno de Puerto Rico, a la luz de la legislación aprobada
Para dramatizar la situación tan difícil que enfrenta el País, la Ley Núm. 7 comienza su Exposición de Motivos señalando que
Puerto Rico atraviesa por la crisis fiscal más grave de nuestra historia. [Encontrándose en] una recesión económica que está en su cuarto año consecutivo y que está al horde de convertirse en una depresión — la primera en Puerto Rico desde la década de los 1930’s. (Énfasis suplido.)(58)

Las razones para la crisis

Señala la Exposición de Motivos de la Ley Núm. 7 que el *51 Gobierno de Puerto Rico enfrenta un déficit estructural re-currente de aproximadamente $3,200 millones, lo que equivale al 42% de los recaudos estimados para este año fiscal. El Gobierno no cuenta con los recursos para cubrir sus gastos operacionales.(59) A partir del primer semestre del 2006, Puerto Rico ha sufrido tres años consecutivos de crecimiento económico negativo. De julio de 2007 a junio de 2009, la economía del País se habría contraído a razón de 2.6% anual, proyectándose una caída económica que conti-nuará durante el próximo año fiscal; se estima que la eco-nomía se reducirá por lo menos un 2% adicional en el año fiscal 2010.(60)
El problema es que “[c]umulativamente, Puerto Rico ha-brá experimentado cuatro años corridos de recesión”, lo que constituiría “una depresión económica que básica-mente anularía todo el crecimiento experimentado en los seis años del 2000 al 2006”.(61) Agrava esta situación el hecho de que, según se advierte en la Exposición de Moti-vos de la Ley Núm. 7, a partir del primer semestre de 2006 y hasta la promulgación de la ley, en Puerto Rico hubo una sobreestimación del crecimiento económico, lo que a su vez produjo una sobreestimación en los recaudos del Fondo General del Departamento de Hacienda, durante ese mismo periodo. (62)
Desde el año fiscal 2006 al presente, todos los presu-puestos anuales sobreestimaron los recaudos en un prome-dio de $919 millones anuales o aproximadamente el 10% del presupuesto. Cumulativamente, durante ese período de cuatro años fiscales, los presupuestos anuales del Gobierno sobreestimaron los recaudos en una cantidad no menor de *52 $3,675 millones.(63) Advierte la Exposición de Motivos que la consecuencia más seria de este patrón de sobre estima-ción de recaudos fue “la confección de presupuestos de gas-tos operacionales que excedían sustancialmente los recau-dos y que hacían caso omiso de la condición recesionaria de nuestra economía”.(64) Continúa la Exposición de Motivos señalando que
[d]e acuerdo a la proyección de recaudos más reciente del De-partamento de Hacienda, la diferencia estimada entre los re-caudos y el presupuesto de gastos del año 2009 asciende a $1,888 millones, o aproximadamente el 20% del presupuesto de gastos. Durante el período del año fiscal 2006 al 2009, los gastos operacionales presupuestados habrán excedido los re-caudos en no menos de $4,637 millones. Esta cantidad equi-vale a más de la mitad del promedio de recaudos anuales du-rante los últimos cuatro años fiscales. (Enfasis suplido.)(65)
“La gravedad de esta brecha entre los recaudos y los gastos presupuestados se recrudece cuando se consideran los gastos actuales del Gobierno. Desde el año fiscal 2006 al 2009, el Gobierno incurrió en gastos que excedieron en $5,817 millones los ingresos recurrentes”.(66) Finalmente, el resultado neto es de un
... desfase total entre los ingresos y los gastos recurrentes del Gobierno y el entroncamiento de un déficit estructural que para el año fiscal en curso aproxima $3,200 millones y que se proyecta continúe por encima de $3,000 millones anuales por los próximos años fiscales de no tomar medidas inmediatas para estabilizar nuestra situación fiscal y desarrollar nuestra economía. (Énfasis suplido.)

Consecuencias de la crisis

En el 2004, las obligaciones generales de Puerto Rico estaban clasificadas a nivel Baal/A- por las casas acredita- *53 doras Moody’s y Standard & Poor’s.(67) Mientras la situa-ción fiscal y económica del Gobierno ha ido empeorando, la clasificación crediticia ha seguido bajando. En el 2005, am-bas casas acreditadoras degradaron el crédito a Baa2/BBB; en el 2006, Moody’s bajó la clasificación a Baa3, seguido por Standard & Poor’s a BBBen el 2007. Al presente, nues-tra clasificación está en Baa3 /BBB-, a un paso de caer a nivel de “chatarra” (“junk”) y perder su grado de inversión (“investment grade”). (68)
Según la Exposición de Motivos de la Ley Núm. 7, “la degradación de nuestro crédito a “chatarra” sería catastró-fica para Puerto Rico”. (Énfasis suplido.(69) Todas las cuen-tas de retiro individuales, los planes de retiro, tanto públi-cos como privados, y las cuentas de ahorro e inversión que estén invertidas en bonos del Gobierno se verían seria-mente afectadas, al ser fuertemente devaluadas.(70) Esta devaluación vendría acompañada de la necesidad inme-diata de que los tenedores de estas obligaciones tengan que prestar colateral adicional para garantizar sus obligacio-nes con sus acreedores.(71)
En el caso del Gobierno, el estimado del B.G.F. es que el Gobierno tendría que poner, inmediatamente, más de $900 millones en colateral. Por otro lado, todos los individuos, empresas y otras entidades que tengan préstamos u otras facilidades de crédito garantizadas con bonos del Gobierno de Puerto Rico tendrían que prestar colateral adicional para compensar por la pérdida en valor de dichos bonos. El B.G.F. estima que estos requisitos de colateral adicional podrían ascender hasta $1,680 millones. En total, el Go-bierno, individuos, empresas y otras entidades tendrían *54 que poner aproximadamente $2,580 millones en colateral adicional como consecuencia de la degradación.(72) La con-fluencia de éstos y otros efectos adversos que se señalan en la Exposición de Motivos
... recrudecería nuestra recesión económica y resultaría en la pérdida, según los modelos econométricos de la Junta de Pla-nificación, de aproximadamente 130,000 empleos para un im-pacto adicional en nuestra economía de aproximadamente $3,250 millones. El impacto total de la degradación a “chata-rra” sería catastrófico. Según los estimados anteriores, el im-pacto total no sería menor de $10,000 millones', esto equivale a aproximadamente el 17% del Producto Nacional Bruto de Puerto Rico ó 1.3 veces los recaudos proyectados del Gobierno para el año fiscal en curso. (Énfasis suplido.)(73)
Para finalizar, en cuanto a los efectos de esta devalua-ción, y las consecuencias que tendría sobre la Isla, la Ex-posición de Motivos señala que “la degradación llevaría a Puerto Rico a una profunda depresión económica nunca antes vista en nuestra historia”, cuyo impacto “sería inimaginable”. (Enfasis suplido.)(74) Se añade que
[h] abría una reducción abrupta en los recaudos y una imposi-bilidad de recurrir a financiamientos para suplir insuficien-cias presupuestarias. El déficit operacional del Gobierno as-cendería a proporciones nunca antes vistas [y] ... simplemente no tendría los recursos para continuar operando: no podría pagar los salarios de todos sus empleados; no podría cumplir con las obligaciones incurridas con todos sus proveedores de servicios y materiales; no podría proveer todos los servicios y beneficios ... ala ciudadanía', y estaría en riesgo de incumplir sus obligaciones con los bonistas. El Gobierno tendría que re-ducir dramáticamente sus operaciones, ... tendría que cerrar temporera o permanentemente algunas de sus dependencias; y tendría que concentrar sus limitados recursos en aquellos servicios esenciales mínimos que más necesita la ciudadanía. *55 Este escenario pondría en manifiesto riesgo la salud, la segu-ridad y el bienestar del Pueblo de Puerto Rico. (Enfasis suplido.)(75)

Las alternativas ante la crisis

La Exposición de Motivos de la Ley Núm. 7 advierte una ausencia de soluciones fáciles, señalando que el Goberna-dor de Puerto Rico ha tomado medidas inmediatas de control de gastos, incluyendo: la congelación de puestos vacan-tes; la prohibición a la creación de nuevos puestos; la eliminación de un 30% de los puestos de confianza en las agencias; la reducción de gastos operacionales equivalente al 10% de la mitad de los gastos operacionales presupues-tados para el año fiscal 2008-2009; la prohibición del uso de tarjetas de crédito; la limitación al uso de vehículos ofi-ciales; y la prohibición del uso de fondos públicos para su-fragar gastos relacionados al uso de teléfonos celulares, en-tre otras medidas.(76)
Ahora bien, añade la Exposición de Motivos que “un dé-ficit estructural de [Za magnitud como el que enfrenta la Isla] no se puede eliminar solamente con reducciones de gastos o solamente con medidas impositivas” .(77) También se expresa lo siguiente:
Las medidas impositivas necesarias para cerrar una brecha de $3,200 millones ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica. Requeriría un au-mento total en contribuciones no menor de 42% ($3,200 millo-nes adicionales a los recaudos proyectados de $7,400 millones) para poder levantar esta cantidad de dinero. Requeriría au-mentos dramáticos en las tasas del Impuesto sobre Ventas y Uso (“IVU”), las tasas de contribuciones sobre ingresos, y los arbitrios sobre autos, gasolina, petróleo y otros artículos. Im- *56 poner cargas de esta magnitud en una economía recesionaria sería devastador para Puerto Rico. (Énfasis suplido.)(78)
Por otro lado, cubrir este déficit estructural solamente con reducciones de gastos gubernamentales podría tener un efecto devastador sobre la operación del Gobierno, los servicios a la ciudadanía y la economía en general. (79) Se indica que
[a] modo de ejemplo, una reducción de $3,200 millones reque-riría la cesantía de aproximadamente 110,000 empleados del Gobierno Central (estimando un costo de $30,000 por empleado). En un Gobierno Central de aproximadamente 190,000 empleados, esta reducción representaría el 58% de la plantilla gubernamental. Este tipo de acción convertiría al Go-bierno en inoperante y afectaría seriamente los servicios a la ciudadanía, poniendo en riesgo la salud y la seguridad de nuestro Pueblo. Nuestro Gobierno se vería prácticamente inca-pacitado de ayudar a este gran número de empleados cesan-teados, sumida en una recesión que ciertamente se agravaría con tal acción, tampoco podría absorber a todos estos emplea-dos en otros sectores. (Énfasis suplido.)
Además, la Exposición de Motivos de la Ley Núm. 7 explica claramente que una reducción de jornada general, como una alternativa viable para reducir el déficit estruc-tural y mantener las operaciones del Gobierno, no es posi-ble, por dos razones. (80) En primer lugar, la magnitud de la reducción de jornada en todos los empleados públicos que se necesitaría para alcanzar los recortes necesarios, reque-riría una reducción de aproximadamente 2 a 3 días a la semana. Esto equivaldría a una reducción de 40% a 60% en el sueldo de todos los empleados públicos. (81) Además de impactar enormemente los ingresos de estos empleados y crear un desasosiego general dentro y fuera del Gobierno,
*57 “[u]na reducción de jornada de 2 a 3 días por semana de-jaría al Gobierno prácticamente inoperante”. (Enfasis suplido.)(82)
Segundo, aún de considerarse alguna combinación de una transición de un número menor de empleados con una reducción de jornada general para los empleados restantes que no rinden servicios esenciales, la reducción de jornada tendría que ser considerable para lograr los ahorros necesarios. Esta reducción tendría que ser por lo menos de un 20% del salario o un día a la semana, y tendría que ser indefinida. Esto es, la reducción de jornada duraría un mí-nimo de tres años fiscales, pudiendo ser más dependiendo de la condición recesionaria de la economía de Puerto Rico.(83)

La solución implantada por la Asamblea Legislativa

Ante el cuadro económico y fiscal al que el País se en-frenta, la Asamblea Legislativa decidió que la forma de cerrar el déficit estructural es creando un balance entre medidas de control y reducción de gastos y medidas de ingresos. En ese sentido, se estableció un plan mediante el cual no más del 40% del déficit estructural estimado de $3,200 millones deberá ser cubierto con nuevas medidas de ingresos o de mejor fiscalización y medidas financieras.(84) Con relación al restante 60% de este plan, la Exposición de Motivos de la Ley Núm. 7 señala lo siguiente:
Luego de la implantación de las medidas impositivas, el res-tante 60% del déficit estructural, aproximadamente $2,000 millones, se tiene que atender mediante el control y la reduc-ción de gastos. Aproximadamente el 27% del presupuesto de gastos del gobierno está comprometido con el servicio de la deuda del Gobierno .... El remanente, aproximadamente 73%, es la base de gastos sujeta a control discrecional. [O sea,] ... (a) *58 gastos operacionales que no constituyen nómina y (b) gastos operacionales de nómina. En el presupuesto del año fiscal 2009, la proporción entre estas dos partidas es 33% en gastos operacionales que no constituyen nómina, $2,700 millones, y 67% en gastos operacionales de nómina, $4,700 millones.
En vista de esta distribución de gastos, es prácticamente im-posible lograr la reducción necesaria sin afectar la nómina gubernamental. Si las economías se fueran a capturar sola-mente en gastos operacionales (que no incluyen nómina) y su-poniendo que estos gastos ascienden a $2,700 millones ... ha-bría que recortar aproximadamente 74% de estos gastos. En estos momentos, esto es una imposibilidad. Es lamentable, pero necesario, contemplar una reducción sustancial en la nó-mina gubernamental. (Enfasis suplido.(85)
V
Como ya hemos señalado, una ley de carácter socioeco-nómico —como lo es la Ley Núm. 7— requiere que al eva-luar su constitucionalidad a la luz de la cláusula de debido proceso de ley en su vertiente sustantiva, apliquemos un escrutinio racional. Este escrutinio implica, en primer lu-gar, la necesidad de evaluar si la acción del Estado, en este caso la Ley Núm. 7 —como una legislación que afecta de-rechos de propiedad protegidos por la Constitución— guarda una relación real y sustancial con el interés estatal que persigue. En otras palabras, si existe un nexo, una co-nexión entre lo que se hace y lo que se pretende, y si esa acción es de alguna manera significativa. En segundo lu-gar, debemos discernir si ese nexo real y sustancial es uno además razonable y, por ende, no arbitrario ni caprichoso.

Relación real y sustancial con el interés que persigue

La Ley Núm. 7 es muy clara con relación al interés que *59 persigue. Su declaración de propósitos en el Art. 2 así lo establece:(86)
... la necesidad apremiante de establecer un plan integrado y coherente de estabilización fiscal, la eliminación del déficit es-tructural, la amortización de la deuda pública, el restableci-miento de la salud fiscal y las bases para que el Gobierno pueda impulsar el desarrollo económico de Puerto Rico. (Enfa-sis suplido.)
Como se desprende del Art. 2 de la Ley Núm. 7, el inte-rés del Estado al promulgar dicha ley no solamente es le-gítimo sino que es uno apremiante. Así, aunque el interés que se le exige al Estado demostrar bajo el escrutinio ra-cional es uno legítimo, según la Ley Núm. 7 trasluce ser un interés apremiante.
En los casos de autos, las acciones por parte del Estado que debemos someter al escrutinio racional lo constituyen las cesantías de los recurridos, así como la eliminación de unos procesos anteriores a esas cesantías, establecidos me-diante la Ley Núm. 184, esto en virtud de la Ley Núm. 7. Resolvemos que en este caso existe una clara relación real y sustancial, entre la acción del Estado y el interés que persigue.
La cesantía de los recurridos, junto a las cesantías de los demás miles de empleados, aunque lamentables, provo-carán, sin duda alguna, un ahorro real y sustancial en las arcas del gobierno.(87) Por otro lado, la eliminación por parte de la Ley Núm. 7 de todos los procesos anteriores a una cesantía que establece la Ley Núm. 184 responden a la necesidad de que el propósito de la ley se alcance de ma- *60 ñera apremiante. Como expresa el Art. 37.04(b)(1) de la propia Ley, existe urgencia en corregir los problemas fisca-les que enfrentamos. El trámite de cesantías que establece la Ley Núm. 184 es uno basado en el principio de méritos, el cual es incompatible con el propósito del Art. 2 de la Ley Núm. 7.(88) Este trámite conllevaría el que, antes de decre-tar una cesantía, se tendrían que agotar todos los recursos disponibles al alcance de la agencia.(89) Esto le restaría al Gobierno la agilidad que necesita para alcanzar sus fines, de manera apremiante.
Además, la ley en cuestión presenta un cuadro fiscal de un Gobierno que se encuentra al borde del caos. Esta con-clusión no está basada en meras especulaciones sin funda-mento, sino en fuentes autorizadas, como lo son: la Junta de Planificación, el B.G.F. y los Informes de Transición 2008, de Presupuestos del Gobierno de Puerto Rico, de la OGP y del Departamento de Hacienda. Tal situación, con-cluimos, justifica el estado de emergencia fiscal declarado por la Asamblea Legislativa y, por ende, la necesidad de utilizar procedimientos que realmente respondan a tal urgencia. Sin duda, existe una relación real y sustancial entre la eliminación de esos procedimientos, y el interés o fin que el Estado persigue.

La razonábilidad de la acción del Estado

Habiendo determinado la existencia de una relación real y sustancial entre la acción del Estado y el interés que *61 persigue, nos corresponde establecer si tal acción es una razonable. Ya hemos determinado que la situación fiscal del Gobierno y las consecuencias de no conseguir el obje-tivo establecido para con la economía del País, justifican el estado de emergencia fiscal declarado por la Asamblea Legislativa. Ahora bien, a la luz de ese estado de emergen-cia fiscal, ¿se justifica la acción de la Asamblea Legislati-va?; ¿es razonable la manera en que se ha pretendido resolver tal emergencia? La respuesta es en la afirmativa.
En Bayrón Toro v. Serra, 119 D.P.R. 605, 623 (1987), reconocimos que ante una grave crisis fiscal, el Estado debe tener la capacidad y la flexibilidad para hacer cam-bios y enmiendas razonables que sean necesarias para ade-lantar sus intereses; claro está, siempre que estos sean legítimos. Ante el cuadro que presenta la propia ley, y nues-tra obligación de adoptar una actitud de gran deferencia hacia la actuación legislativa, debemos concluir que el Es-tado actuó razonablemente. Como claramente se explica en la Exposición de Motivos:
Todas las alternativas típicamente usadas como pasos previos a la reducción de personal [o sea] traslados, reubicaciones, readiestramientos, licencias sin sueldo y reducción de jornada, entre otros no son viables dentro del contexto de la magnitud del déficit estructural del Gobierno y la precariedad de la situación. Es necesario reducir dramáticamente y de forma ex-pedita, el gasto gubernamental. En vista del tamaño de la nó-mina y del tamaño del déficit, ninguna de las demás alterna-tivas es compatible con este objetivo o son viables ante su impacto sobre la operación del Gobierno. Los traslados, las reubicaciones y los readiestramientos meramente transfieren el empleado y, por consiguiente, el gasto de un lado a otro. La reducción general de jornada y mucho menos las licencias sin sueldos, no son alternativas viables pues tendrían que ser de tal magnitud y duración que impactarían gravemente lagober-nabilidad de la Rama Ejecutiva. (Énfasis suplido.)(90)
Por otro lado, y como también se explica en la Exposi- *62 ción de Motivos de la ley, el establecer medidas impositivas únicamente, tampoco es una alternativa viable. De manera que la Asamblea Legislativa, como funcionarios electos y legítimos representantes del Pueblo de Puerto Rico, deter-minaron que la imposición al contribuyente de los recaudos necesarios para cerrar una brecha de $3,200 millones en el déficit ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica. Sin duda, no nos co-rresponde intervenir con tal determinación.
Concluimos entonces que la actuación del Gobierno al promulgar la Ley Núm. 7, en el contexto de las cesantías que autoriza y promueve, así como la eliminación de unos procesos anteriores a esas cesantías, constituye una acción razonable dirigida a salvar la solvencia del erario, a la luz de las circunstancias que vive el País.

Puesto que, ante un análisis jurídico de escrutinio racio-nal, la actuación de la Asamblea Legislativa claramente se sostiene, resolvemos que la Ley Núm. 7, en el contexto de las cesantías que autoriza y promueve, así como la eliminación de unos procesos anteriores a esas cesantías, no viola el debido proceso de ley sustantivo.

VI
Resuelto el aspecto procesal sustantivo, nos corresponde analizar si las cesantías anunciadas violan el debido pro-ceso de ley en su aspecto procesal. Debemos determinar entonces, si la Ley Núm. 7, dentro de las circunstancias que se han descrito, le provee a las partes una “oportuni-dad de ser oídos”, o sea, de un proceso justo. Además, de-bemos determinar si, contrario a lo esbozado, la Ley Núm. 7 le concede a los empleados por cesantear una vista previa informal antes de ser cesanteados.
Como hemos advertido, las cesantías que autoriza la Ley Núm. 7 se rigen única y exclusivamente por el criterio *63 de antigüedad.(91) Es de notar que el procedimiento que establece la ley en cuestión es bastante similar al que es-tablece la Ley Núm. 184 para este tipo de despido. La See. 6.6(9)(a) de la Ley Núm. 184,(92) en lo pertinente, dispone lo siguiente:
A los fines de determinar antigüedad, se considerara todo ser-vicio prestado en puestos de las agencias comprendidas en el Sistema. La autoridad nominadora de cada agencia notificará por escrito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que ha-brá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación. (Énfasis suplido.)
De una lectura de las disposiciones pertinentes en am-bos estatutos podemos colegir, en primer lugar, que ambas requieren, para determinar la antigüedad, el que se consi-dere todo servicio prestado en el servicio público por los empleados afectados.(93) Además, ambas leyes requieren que la autoridad nominadora de cada agencia notifique por escrito a todo empleado a quien haya de cesantear. (94) Am-bas leyes requieren que la notificación de la cesantía se haga con no menos de treinta días de anticipación. (95)
Además, ambos estatutos les conceden a los empleados la oportunidad de cuestionar las determinaciones, no sólo ante la propia agencia, sino ante la CASARH o ante la Comisión creada al amparo del Art. 11 de la Ley Núm. 45 (3 L.P.R.A. see. 14521). En otras palabras, la Ley Núm. 7 recoge los procedimientos que rigen según la Ley Núm. 184, y los adapta con el propósito de expeditar el trámite para decretar cesantías mediante un mecanismo más ágil.
*64 Por otro lado, la Ley Núm. 7 concede al empleado el que, aun antes de ser notificado finalmente de su cesantía, cuestione la certificación de antigüedad emitida por la agencia, concediéndole treinta días para presentar evidencia que la refute.(96) También y en la eventualidad de que el empleado presente esa evidencia en el término concedido, la agencia estará obligada a celebrar una vista donde éste pueda ser oído.(97)
En el caso de que se decida finalmente su cesantía, los Arts. 37.04(b)(12), 37.04(b)(13) y 37.04(b)(14) de la Ley Núm. 7, establecen que el empleado tendrá que ser notificado de manera personal o por correo certificado, y en caso de pertenecer a una organización sindical, también deberá notificársele a ésta. Además, tal notificación deberá advertir que el cesanteado cuenta con treinta días para acudir en revisión a CASARH o ante la Comisión Apelativa creada al amparo de la Ley Núm. 45, supra, conforme sea el caso.(98)
Al evaluar el procedimiento de cesantías establecido por la Ley Núm. 7 ala luz de los criterios pautados en Rivera Rodríguez & Co. v. Lee Stowell, supra, es claro que éste sobrepasa los requisitos esperados. Nótese que las cesan-tías al amparo de este estatuto se dan en razón del criterio de antigüedad únicamente, por lo que, una revisión de la decisión de la Agencia se daría, como señala el Art. 37.04(b)(13) de la Ley Núm. 7, solamente en cuanto a ese criterio. Eso redunda en que la controversia, por meritoria que sea, siempre será relativamente sencilla: si el em-pleado cuenta con la evidencia de los años trabajados.
*65 En los casos ante nuestra consideración, los recurridos fueron notificados de sus cesantías, por escrito, y mucho antes de los treinta días que requiere la Ley Núm. 7, como establece el Art. 37.04(b)(15). Nada en los expedientes de autos indica que tales cartas no fueran notificadas en con-formidad con el Art. 37.04(b)(12) de la ley, esto es, perso-nalmente o por correo certificado. Las cartas de cesantías claramente indicaban la razón de sus despidos y de su de-recho a solicitar revisión de la determinación de la agencia ante CASARH o ante la Comisión, en el término de treinta días, contados a partir del recibo de la misiva. Sin duda, los recurridos contaron con una adecuada notificación.
Por otro lado, la Ley Núm. 7 dispone para que un orga-nismo competente e imparcial atienda sus reclamos y aqui-late la evidencia que éstos puedan presentar, en caso de que decidan recurrir finalmente de la decisión de la agencia. De manera que es claro que la Ley Núm. 7 garan-tiza a los aquí recurridos una oportunidad real y justa de ser oídos.
Es evidente entonces que, a la luz de las circunstancias, el proceso establecido por el Capítulo III de la Ley Núm. 7 es uno que sobrepasa el mínimo requerido por la norma-tiva jurisprudencial en lo referente al debido proceso de ley en su aspecto procesal. Por lo tanto, al evaluar el procedi-miento de cesantías establecido por la Ley Núm. 7 ala luz de los criterios pautados en Rivera Rodríguez & Co. v. Lee Stowell, es claro que éste sobrepasa los requisitos espe-rados.
Por otro lado y como adelantamos, tanto en los recursos CT-2009-4 y CT-2009-5, como en el CT-2009-9, los recurridos han planteado que el Estado les violó el debido proceso de ley por no concederle una vista informal previa a las cesantías. No les asiste la razón. La Ley Núm. 7 claramente concede al empleado público cesanteado al amparo de esa ley la oportunidad de una vista previa antes de que se le anuncie su cesantía, si éste así lo solicita.
*66 Como hemos dicho, las cesantías que autoriza la Ley Núm. 7 se dan única y exclusivamente bajo el marco o el criterio de antigüedad del empleado público. En ese con-texto, una vez la J.R.E.F. dispuso la cantidad global de empleados a ser cesanteados —Art. 37.04(b)(7)— el Art. 37.04(b)(8) dispone que cada agencia notificará tanto a la J.R.E.F. como al propio empleado —y a la organización sin-dical si fuera el caso— “su fecha de antigüedad según surge de sus récords ... apercibiéndole del derecho que tiene ... a exponer ... por escrito su versión en cuanto a su fecha de antigüedad”. (99) El Art. 37.04(b)(9) dispone que el empleado tendrá un término de treinta días, contados a partir de la fecha de la notificación por parte de la agencia de su fecha de antigüedad según surge de sus récord, para “presentar por escrito ... evidencia documental ... que refute la antigüedad que le ha sido certificada”. (100)
Si el empleado no presenta la evidencia documental re-querida para refutar la certificación de la agencia en el término dispuesto, “la antigüedad a ser utilizada será aquella que le fue notificada por la agencia”, antigüedad que sería entonces concluyente para efectos del Capítulo III de la Ley Núm. 7. A contrario sensu,
[e]?z la eventualidad de que el empleado afectado presente, dentro del término aquí dispuesto, evidencia documental feha-ciente que controvierta la antigüedad que le ha sido notificada, la Agencia no tomará determinación final sobre la antigüedad sin antes darle la oportunidad de tener una vista previa. (En-fasis suplido.) Art. 37.04(b)(ll).
Nada en los expedientes de los casos de autos evidencia que a algunos de los recurridos no se les hubiera certifi-cado su antigüedad y se les hubiera negado la oportunidad de refutarla en una vista anterior a que se les anunciara sus cesantías, de haberlo solicitado. Por lo tanto, es evi- *67 dente que tampoco les asiste la razón a los recurridos en este punto.
VII

Derechos adquiridos

En su alegato las partes recurridas en el caso CT-2009-4 argumentan que “[e]l Art. 3 del Código Civil de Puerto Rico ... dispone que, ‘[fias leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario y, en ningún caso, podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior’, conforme lo establece la doctrina de derechos adqui-ridos.”(101) En ese contexto señalan que la aplicación de la Ley Núm. 7 elimina derechos laborales garantizados me-diante legislación laboral protectora que estaba en vigor con anterioridad a la aprobación de dicha ley, por lo cual vulnera el principio de la aplicación retroactiva de las le-yes, tal como el derecho de retención y el derecho propieta-rio sobre su empleo garantizado en la Constitución.(102) Es-pecíficamente argumentan los recurridos que:
El derecho propietario que tiene el empleado público sobre su empleo no se le [sic] puede ser eliminado a menos que éste tenga una participación activa y consciente en el método que ha de utilizarse para la eliminación de ese derecho. Nuestro más alto foro ha expresado que ninguna nueva ley promul-gada por la legislatura puede tener [sic] dejar sin efecto y de facto derogar disposiciones que estaban en vigor antes de en-trar en efecto la misma y que tenga como consecuencia elimi-nar derechos adquiridos.(103)
*68 Además, citando lo resuelto recientemente por esta Curia en Hernández, Romero v. Pol. de P.R., 177 D.P.R. 121, 146 (2009), y con relación a los derechos adquiridos, los recurridos señalan que “ni la Legislatura al promulgar una nueva ley, ni el Gobernador mediante una orden ejecutiva, los puede lesionar o ignorar”.(104)
Estas argumentaciones claramente parten de la pre-misa de que los recurridos ostentan un derecho adquirido. Sin embargo, y como señalamos también en Hernández, Romero v. Pol. de P.R., supra, “los derechos adquiridos pro-tegidos pueden concebirse como ‘consecuencia de un hecho idóneo, al producirlos en virtud de una ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado a una persona’ ”. (Énfasis suplido.)(105) Ese no es el caso con los empleados de carrera en el servicio público.
Indudablemente, un derecho adquirido, como secuela de un derecho propietario, se encuentra cobijado por la protección que la See. 7 de nuestra Carta de Derechos provee. Sin embargo, no todo derecho o interés propietario es a su vez un derecho adquirido. (106) Asimismo, “no toda situación jurídica que surge al amparo de una ley anterior es un derecho adquirido cobijado por el principio de irretroactividad frente a otra ley posterior”.(107)
Como señala Noguera Barreneche, un derecho adqui-rido implica
... la conjunción de una norma jurídica existente (situación abstracta de derecho) y la ejecución de un hecho por ella misma previsto (situación concreta); pero que, por razón de la
*69 importancia del derecho desde el punto de vista del interés social, ha recibido vida perdurable de la ley que lo generó”. (Énfasis suplido.)(108)
Asimismo, en Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 109 (2006), pautamos que “[e]l derecho ad-quirido ... es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior”. (Enfasis suplido.)
Como hemos señalado, un empleado en el servicio público tiene un reconocido interés en la retención de su empleo, si dicho interés está protegido por ley o cuando las circunstancias crean una expectativa de continuidad. Es la presencia de estos factores lo que determina la existencia de un interés propietario.(109) Asimismo, un empleado público ostenta un evidente interés en la retención de su empleo, siempre y cuando ese interés se encuentre protegido por una ley, como en el caso de un empleado de carrera, o cuando las circunstancias crean una expectativa razonable de continuidad.(110)
Sin embargo, ninguna ley al momento le reconoce al empleado público un derecho sin limitaciones a la retención, o un derecho a no ser cesanteado. Al contrario, todas las leyes concernientes al asunto reconocen como una realidad la posibilidad de que el empleado público no sea retenido o sea cesanteado de su puesto, si se dan unas condiciones y se cumple con unos procesos.(111) En ese sentido, no cabe hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, pues *70 se encuentra ausente el elemento del amparo de una ley anterior que hubiese concedido tal derecho.
VIII

Igual protección de las leyes

A. La See. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho a la igual protección de las leyes. En lo pertinente dispone que “[n]inguna persona será privada de su libertad o propiedad sin [el] debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes”. (Enfasis suplido.)(112)
La igual protección de las leyes se funda en el principio cardinal de trato similar para personas similarmente situadas.(113) Esto significa que el gobierno puede hacer clasificaciones entre las personas para cualesquiera propósitos legítimos siempre que observe esa norma básica.(114) “El fundamento de este precepto surge de la concepción básica de que para gobernar una sociedad tan compleja y variada, en la cual existen distintos intereses individuales y grupales, y diversas relaciones sociales, es necesario establecer clasificaciones.”(115) Es decir, gobernar cualquier sociedad y en especial una sociedad moderna sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y peijudiquen a otros es imposible.(116)
Como corolario de lo anterior, hemos expresado *71 que el principio constitucional de la igual protección de las leyes no exige que siempre se dé un trato igual a todos los ciudadanos sino que prohíbe un trato desigual e injustificado.(117) El Estado puede hacer clasificaciones en-tre las personas sin que se quebrante el consabido princi-pio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo.(118) Es decir, la desigualdad que infringe la Cons-titución es la que refleja una preferencia basada en prejui-cio, no la que descansa en un interés público.(119)
De ahí, que el problema principal que plantea la aplicación de la igual protección de las leyes es el de diseñar normas que permitan al gobierno establecer clasificaciones, pero que a la vez protejan a las personas contra desigualdades indebidas, irrazonables u odiosas.(120) Por eso, para realizar esa tarea, se requiere hacer un análisis de la relación entre el propósito que se desea lograr y el medio o clasificación que se utiliza para alcanzarlo; también debe examinarse el efecto que esa relación tiene sobre el derecho o interés del cual se priva a las personas afectadas.(121)
Este Foro ha reiterado que bajo la igual protección de las leyes, cuando un tribunal en Puerto Rico se enfrenta a un análisis constitucional sobre la razonabilidad de una clasificación legislativa, el criterio o escrutinio que ha de utilizar deberá ser el escrutinio tradicional mínimo o de nexo racional o el escrutinio estricto.(122)
Como señalamos, el escrutinio racional es em- *72 pleado en casos donde se impugne reglamentación de tipo económica y social. Al aplicarlo, se presume la constitucio-nalidad de la clasificación.(123) Además, el tribunal tiene que adoptar una actitud de gran deferencia hacia la actua-ción legislativa que se impugne. Aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se demuestre que existe una relación racional entre ésta y el propósito esbozado. La intervención judicial será muy limitada.(124)
Sobre este análisis hemos expresado que por virtud del axioma de separación de poderes, es la Legislatura y no la Rama Judicial, la que tiene la facultad de diseñar las clasificaciones de tipo socioeconómica.(125) Por consiguiente, el tribunal no puede adjudicarse las funciones de la legislatura al examinar la constitucionalidad de un estatuto conforme a la garantía de la igual protección de las leyes.(126)
De acuerdo con este escrutinio le corresponde a la parte que sostiene la inconstitucionalidad de la clasificación demostrar que no existe nexo racional alguno entre la clasificación impugnada y un interés legítimo del Estado. San Miguel Lorenzana v. E.L.A., supra. El tribunal solamente declarará inconstitucional la clasificación si ésta discrimina de forma arbitraria e irracional.(127) El discrimen arbitrario o irracional existe cuando la diferencia que la clasificación establece es totalmente irrelevante al propósito que se pretende alcanzar con ella.(128)
*73 Como puede observarse, la enunciación sobre el están-dar de adjudicación de racionalidad mínima al amparo de esta cláusula es muy similar a la del debido proceso de ley en materia de reglamentación económica. La diferencia consiste en que conforme a la igual protección de las leyes lo que se enjuicia es la razonabilidad de la clasificación discriminatoria, a la luz del objetivo o propósitos que se desea alcanzar, en tanto que en virtud del debido proceso de ley la pregunta es si la medida gubernamental, con in-dependencia de si contiene alguna clasificación, es razona-ble a la luz de su propósito.(129)
Por su parte, el escrutinio estricto se utiliza para analizar las clasificaciones que son sospechosas o cuando la clasificación afecta un derecho fundamental. San Miguel Lorenzana v. E.L.A., supra, pág. 425. Las clasificaciones sospechosas son aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas o nacionalidad.(130) En tomo a los derechos fundamentales se ha reconocido el derecho al voto, libertad de culto, libertad de expresión, a la vida, protección de ley contra ataques abusivos a la honra y el derecho a la intimidad.(131)
Bajo el palio de este escrutinio se presume la inconstitucionalidad de la disposición impugnada.(132) El Estado tiene el peso de la pmeba para demostrar que la clasificación responde a un interés estatal apremiante y que ésta es necesaria para promover ese interés, es decir, que *74 no existe un medio menos oneroso para adelantar o alcan-zar tal interés.(133)
Considerando todo lo anterior, procedemos a resolver la controversia planteada sobre este asunto en el CT-2009-06.
B. En el CT-2009-06 la parte recurrida alega que la Ley Núm. 7 crea unas clasificaciones sospechosas entre empleados públicos sin justificación racional para ello por-que exime de su aplicación a los empleados de las ramas judicial y legislativa. No le asiste la razón.
Como ya mencionamos, en Puerto Rico las clasificaciones sospechosas están expresamente enumeradas en la Sec. 1 del Art. II de nuestra Constitución, Tomo 1, L.P.R.A. Es decir, deben ser clasificaciones por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas, ideas religiosas o nacionalidad. Prima facie, la clasificación que alega la parte recurrida no se fundamenta en ninguna de las prohibiciones comprendidas en la antedicha sección. Por ende, no estamos frente a una clasificación de tipo sospechosa. Ahora bien, debemos determinar si la clasificación impugnada soslaya algún derecho fundamental de la parte recurrida. En específico, el derecho a trabajar.
La parte recurrida acota e insiste en que el derecho a trabajar es uno fundamental y que éste le fue violado con la decisión del Estado de cesantearla. Es cierto e indubi-tado que los empleados afectados por la Ley Núm. 7 tienen derecho a trabajar y que dicho derecho es uno muy impor-tante en nuestra sociedad y jurisdicción. Así lo reconocimos en Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 421 (1985), cuando expresamos que:
El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones *75 conocidas. El destino incierto de la frustrada Sec. 20 de nues-tra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado.(134)
Ciertamente, tales expresiones demuestran la necesi-dad de prestarle cuidadosa atención a aquellas situaciones en las que esté de por medio el trabajo y las necesidades básicas de las personas. Empero, ello no connota, per se, que hayamos reconocido como derecho fundamental el de-recho al trabajo.(135) De hecho, en García v. Aljoma, 162 D.P.R. 572, 596 (2004) este Tribunal, por voz del Juez Pre-sidente Señor Hernández Denton, sostuvo que la Sec. 20 de la Constitución del Estado Libre Asociado de Puerto Rico “sólo enumeraba aspiraciones que dependían para su cum-plimiento del desarrollo económico del País. Se trata de una disposición que reconocía, aunque no garantizaba, ciertos derechos humanos y sugería el mayor esfuerzo del Estado para llevarlos al plano práctico”. (Citas omitidas.) Esos derechos son de naturaleza económica y social.(136)
Con mayor razón, en García v. Aljoma, supra, pág. 596, este Tribunal declaró de forma tajante que
[e]n vista de un historial legislativo tan claro, no podemos avalar la determinación judicial del Tribunal de Apelaciones que instala un derecho expresamente excluido del ámbito de las garantías constitucionales de la Carta de Derechos, me-diante la interpretación de otro derecho constitucional. La consecuencia del veto del Congreso de la Sec. 20 del Art. II de la Constitución, y de la correspondiente aceptación de la Con-vención Constituyente, fue excluir el derecho a obtener un tra-bajo como garantía constitucional. (Énfasis suplido.)(137)
Asimismo, en San Miguel Lorenzana v. E.L.A., supra, pág. 430, citando a los tratadistas de derecho constitucio- *76 nal, Rotunda, Nowak y Young, señalamos que “no existe un derecho fundamental federal a adquirir o mantener un em-pleo en el sector público”.
A la luz de lo esbozado, podemos colegir que el derecho al trabajo no es un derecho fundamental garantizado por nuestra Constitución. Claro está, eso no significa que las aspiraciones plasmadas en la aludida Sección 20 no puedan perseguirse por el pueblo puertorriqueño. No obstante, ese objetivo no es tarea de la Rama Judicial sino que le compete a la Asamblea Legislativa.(138)
Por otro lado, en San Miguel Lorenzana v. E.L.A., supra, págs. 428-429, reconocimos que “el derecho a un empleo está estrechamente relacionado con la garantía de que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley”. “ [E]l derecho a un empleo va principalmente dirigido a garantizar que ante la privación de éste se cumpla con los requisitos del debido proceso de ley”. íd., pág. 429. Allí también, citando con aprobación al tratadista Lawrence H. Tribe, expusimos, ad verbatim:
Although we have argued ... that among the rights to bodily integrity are rights to at least minimal subsistence and that such rights give rise to affirmative governmental duties, we could not deduce from such duties a judicially cognizable remedy for every instance of unmet needs; as we saw, government’s affirmative duties must ordinarily be translated into doctrine somewhat more obliquely— through a variety of procedural, structural, and other protections designed, in their cumulative effect, to minimize the risk that someone will in fact suffer extreme deprivation. Among those protections has been a revitalized concern to prevent at least procedurally unfair exclusions from the occupation or vocation of one’s choice.
[J]ust as we have seen that a claim of unmet needs does not automatically give rise to a judicially cognizable basis for in *77 sisting that government step in with specific services, so it must be the case that, even with respect to employment, not every frustrated wish creates a constitutional cause of action against the state. As Justice Douglas said in his Barsky dissent, ‘[c]ertainly a man has no affirmative right to any particular job or skill or occupation. The Bill of Rights does not say who shall be doctors or lawyers or policemen. But it does say that certain rights are protected, that certain things shall not be done. And so the question here is not what government must give, but rather what it may not take away.’ What it may not take away without clear and focused justification is a fair opportunity for an individual to realize her identity in a chosen vocation. San Miguel Lorenzana v. E.L.A., supra, págs. 429-430.
Así pues, en dicho caso reconocimos que el derecho al trabajo, o sea, su privación, tanto en nuestra jurisdicción como en la federal, es un asunto que debe ser examinado al amparo de la cláusula del debido proceso de ley.
A la luz de la antepuesta discusión, y con relación a la cláusula de la igual protección de las leyes, concluimos que la clasificación creada por la aplicación de la Ley Núm. 7, según alegada por la parte recurrida, no es sospechosa y tampoco infringe o interfiere con un derecho fundamental. Por consiguiente, el análisis de tal clasificación debe reali-zarse bajo el escrutinio de nexo racional y no del escrutinio estricto. Es decir, debemos determinar si el Estado tiene un interés legítimo en promover la clasificación impug-nada y si ese interés se relaciona de manera racional con la clasificación.
Como ya hemos discutido previamente, es indudable que de la Ley Núm. 7 surge que el Estado tiene un interés más que legítimo en corregir la crisis fiscal que atraviesa el Gobierno de Puerto Rico. En ese contexto, la clasificación establecida por el Estado y que objeta la parte recurrida, responde a la necesidad de atajar ese problema fiscal. Así, el gasto relacionado a la nómina es uno tan sustancial que hace necesaria la reducción en ese renglón para atacar el déficit presupuestario que se anuncia en la propia ley. Así *78 surge claramente, y como ya hemos expuesto, de su Expo-sición de Motivos(139)
Es ostensible que de la Exposición de Motivos de la Ley Núm. 7 surge la existencia de una relación racional entre la clasificación impugnada (cesantía de los empleados pú-blicos de la rama ejecutiva) y el interés legítimo que persi-gue el Estado en aras de corregir la crisis fiscal descrita en dicha ley.
Igualmente debemos señalar que la clasificación impug-nada por la parte recurrida aplica a un grupo de personas similarmente situadas. Se limita a los empleados públicos que trabajan en distintas agencias del Gobierno adscritas a la rama ejecutiva(140) De hecho, el criterio predicado por la mencionada ley para cesantear a los empleados en cues-tión, es el de antigüedad. Véase Art. 37.04(b)(2),(9),(13) y (14). Es decir, la aplicación de la Ley Núm. 7 es una general y se basa en un criterio neutro que es la antigüedad. En ese sentido, aunque la clasificación impugnada no se ex-tiende a las Ramas Judicial y Legislativa, tampoco pro-mueve un trato desigual e injustificado entre aquellos em-pleados a quienes sí aplica la Ley Núm. 7.
A fortiori, la determinación de la Asamblea Legislativa de promulgar una ley que aplicara únicamente a la Rama Ejecutiva y no a la Legislativa ni Judicial, respeta el prin-cipio cardinal de separación de poderes que consagra nues-tra Constitución. Cabe destacar que tanto la Rama Judicial como la legislativa poseen autonomía presupues-taria(141) De ahí, que son estas ramas las que administran *79 los fondos que se le asignan y las que determinan, de ser necesario, cuándo recortar los gastos, incluyendo la nómina. Permitir, por medio de legislación, que el Poder Ejecutivo pueda tomar decisiones sobre las otras ramas del Gobierno, definitivamente atentaría contra la separación de poderes.(142)
Por todo lo antes expuesto, sostenemos que la diferencia en tratamiento que promueve la aplicación de la Ley Núm. 7entre las tres ramas del Gobierno, no ofende ni viola la cláusula de la igual protección de las leyes. Por tal, la cla-sificación impugnada, según creada por la Ley Núm. 7, no refleja una preferencia basada en prejuicio. Se trata de una clasificación razonable, fundamentada en un interés público legítimo. No debemos olvidar lo que el Tribunal Supremo federal ha expresado sobre la igual protección de las leyes: “[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that the State’s action be rationally based and free from invidious discrimination.” (Citas omitidas.) Dandridge v. Williams, 397 U.S. 471, 486-487 (1970).(143)
IX

Menoscabo de obligaciones contractuales

A. La Constitución del Estado Libre Asociado de Puerto Rico prohíbe la promulgación de leyes que me- *80 noscaben las obligaciones contractuales.(144) De igual modo, la Constitución federal contiene una cláusula análoga que prohíbe a los estados promulgar leyes que menoscaben las obligaciones contractuales que surjan de contratos públicos o contratos privados.(145) Conforme a lo anterior, a la hora de interpretar nuestra disposición constitucional debemos referimos a las decisiones del Tribunal Supremo federal que evalúan la referida cláusula ya que constituyen la pro-tección mínima que estamos obligados a reconocer en nues-tro ordenamiento.(146)
La garantía contra el menoscabo de obligaciones contractuales limita el poder del gobierno para interferir con las obligaciones contractuales entre partes privadas, así como las obligaciones contractuales contraídas por el Estado.(147) Al considerar la validez de estatutos bajo la referida cláusula, el escrutinio aplicable depende del tipo de contrato en cuestión, ya sea un contrato privado o uno público. Esta diferencia responde a que cuando la modificación se da en el contexto de la contratación pública el escrutinio judicial tiene que ser más cuidadoso “para asegurar que la actuación del Estado no sólo sea en beneficio propio”.(148)
Al evaluar la interferencia del Gobierno en el contexto de la contratación privada, lo primero que procede auscultar es si existe una relación contractual y si la modificación de la obligación constituye un menoscabo sustancial o severo.(149) Luego de determinar que existe un me- *81 noscabo sustancial o severo de una obligación contractual, hay que evaluar si la interferencia gubernamental res-ponde a un propósito o interés legítimo del Estado y si está racionalmente relacionada con la consecución de dicho objetivo.(150) Como vemos, al auscultar la validez de una ley a la luz de la cláusula de menoscabo de obligaciones con-tractuales el criterio aplicable es el de razonabilidad.(151) La razonabilidad de la legislación se determinará tomando en consideración la sustancialidad del interés público pro-movido y la dimensión del menoscabo ocasionado.(152)
Ahora bien, cuando el Estado modifica sus propias obligaciones el escrutinio judicial es más cuidadoso.(153) Claro está, aim cuando el escrutinio en el contexto de la contratación pública es más severo, eso no significa que hay una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público. (154) Por lo tanto, la función del foro judicial al evaluar la validez de una legislación según la cláusula del menoscabo de obligaciones contractuales consiste en establecer un balance entre el poder del Estado (“police power”) para salvaguardar el bienestar y la seguridad de la ciudadanía y el interés de proteger las relaciones contractuales. (155) Atales efectos, en United States Trust Co. v. New Jersey, supra, pág. 21, el Tribunal Supremo federal enunció lo siguiente:
*82 Although the Contract Clause appears literally to proscribe “any’ impairment, this Court observed in [Home Building & Loan Association v. Blaisdell, supra] that “the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.” Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case, as in Blaisdell, we must attempt to reconcile the strictures of the Contract Clause with the “essential attributes of sovereign power,” necessarily reserved by the States to safeguard the welfare of their citizens. (Citas omitidas.)
En atención a lo anterior, al ejercer la revisión judicial sobre la constitucionalidad de legislación según la cláusula del menoscabo de obligaciones contractuales del Estado, diversos tribunales federales de los circuitos apelativos han enfatizado la necesidad de evaluar si el propósito o interés del Estado en promulgar la legislación impugnada responde al ejercicio de su poder de razón de Estado para proteger y mantener el bienestar general, lo que incluye el bienestar económico de la sociedad. A tales efectos se ha señalado lo siguiente:
[T]he Supreme Court has defined “police power” for Contract Clause purposes, “as an excercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people ....” The state’s paramount authority ... is not limited to health, morals and safety. It extends to economic needs as well”. Veix v. Sixth Ward Ass’n, 310 U.S. 32, 39, 60 S. Ct. 792, 795, 84 L. Ed. 1061 81940). This doctrine reflects the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions.(156) (Citas omitidas y énfasis suplido.)
Bajo este marco conceptual, en los casos de contratación pública procede evaluar, como cuestión de umbral, si existe *83 una obligación contractual y si la modificación de la obli-gación constituye un menoscabo sustancial o severo. Res-pecto al análisis sobre la sustancialidad o severidad del menoscabo de la obligación, el Tribunal Supremo federal ha señalado lo siguiente:
The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.
The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their párticular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978).
Conforme a lo anterior, la garantía constitucional contra el menoscabo de obligaciones contractuales se activa cuando la modificación afecta adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración de éste de modo que se frustren las expectativas razonables de las partes.(157) A tono con esta definición, el Tribunal Federal de Apelaciones para el Cuarto Circuito ha señalado que: “While the court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place.” (Énfasis suplido.)(158) Por su parte, el Tribunal Federal de Apelaciones para el Segundo Circuito ha señalado lo siguiente: “To assess whether an impairment is substantial, we look at ‘the extent to which reasonable expectations *84 under the contract have been disrupted(Énfasis suplido. )(159)
Una vez se determina que el menoscabo es sustancial, procede auscultar si la modificación persigue adelantar un interés importante en beneficio del bienestar general. Por último, habrá que dirimir si la modificación, además de razonable, es necesaria para adelantar ese propósito gu-bernamental importante.(160) Si la modificación es razona-ble y necesaria para adelantar el interés público, sosten-dremos la validez de la ley impugnada.(161)
Cabe señalar que respecto al criterio de razonabilidad y necesidad, el Tribunal Supremo federal ha manifestado que no se sostendrá el menoscabo a la obligación contractual del Estado si existen medidas alternas que sean me-nos drásticas o severas que la ejercida por el Estado para lograr su objetivo.(162) A la hora de evaluar la razonabilidad y necesidad de la medida en el contexto de la contratación pública, el Tribunal Supremo federal señaló que, contrario a los casos sobre contratación privada, no es apropiado dar completa deferencia a la determinación legislativa sobre la necesidad o razonabilidad de la legislación. United States Trust Co. v. New Jersey, supra, págs. 22-26 (“As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.... [But, as to public contracts], complete deference to a legislative assessment of reasonableness and necessity is not appropriate ...”). Sin embargo, esto no significa que el foro judicial no deba dar alguna deferencia a la determinación de necesidad y razonabilidad que hizo el legislador en el ejer-cicio de su poder constitucional, especialmente cuando se trata de regulaciones socioeconómicas.
*85 A modo ilustrativo, es meritorio referirnos a la interpre-tación que se ha hecho en los circuitos apelativos respecto al grado de deferencia que se le debe dar a la determina-ción legislativa sobre la necesidad y razonabilidad de la medida. En Local Div. 589, etc. v. Comm. of Mass., supra, pág. 643, el Tribunal Federal de Apelaciones para el Primer Circuito señaló lo siguiente:
[D]etermining the “reasonableness and necessity” of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature’s judgment is surely called for.
De igual modo se manifestó el Tribunal Federal de Ape-laciones para el Segundo Circuito, en Buffalo Teachers Federation v. Tobe, 464 F.3d. 362, 370 (2do Cir. 2006), al enunciar lo siguiente:
We hasten to point out that less deference does not imply no deference. ... Relatedly, we agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue to make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem.
En síntesis, al enfrentarnos a la impugnación de la legislación según la cláusula del menoscabo de obligaciones contractuales del Estado, debemos dar alguna deferencia a la determinación del legislador respecto a la necesidad y razonabilidad de la medida. Al llevar a cabo dicha tarea, es relevante, y aporta a la determinación final de razonabilidad de la medida, el hecho de que la legislación sea en respuesta a una situación de emergencia y que su aplicación sea temporal o transitoria.(163) Conforme a lo anterior, en Buffalo Teachers Federation v. Tobe, supra, págs. 373-372, el Tribunal Federal para el Segundo Circuito consideró la situación de emergencia fiscal de la ciudad de *86 Buffalo y la duración limitada de la medida sobre congela-ción de salarios a empleados públicos para determinar el criterio de razonabilidad y sostuvo la constitucionalidad de la medida. En esa misma línea, el Tribunal Federal de Ape-laciones para el Cuarto Circuito, al sostener la constitucio-nalidad de una medida de reducción de salarios a emplea-dos públicos unionados, determinó que la actuación gubernamental era razonable en atención a la crisis presu-puestaria de la ciudad de Baltimore y a la duración limi-tada de la medida.(164)
Conforme a la doctrina expuesta, procedemos a dirimir si la legislación ante nuestra consideración contraviene la cláusula que prohíbe el menoscabo de las obligaciones con-tractuales en el contexto de la contratación pública.
B. Las recurridas en el CT-2009-6 son empleadas pú-blicas unionadas del Departamento de la Familia y la Ad-ministración del Sustento de Menores. Estas alegan, es-cuetamente, que la Ley Núm. 7 de 9 de marzo de 2009 menoscaba las obligaciones contraídas por el Estado me-diante el convenio colectivo vigente entre las partes a par-tir del 20 de julio de 2007. En específico señalan que la legislación impugnada “violenta el principio de mérito” re-conocido en el convenio colectivo así como otros procedi-mientos para llevar a cabo las cesantías.(165)
Según discutimos anteriormente, en los casos de contra-tación pública procede evaluar, como cuestión de umbral, si existe una obligación contractual y si la modificación de la obligación constituye un menoscabo sustancial o severo. En efecto, existe una relación contractual entre el Estado y los empleados unionados cuyas obligaciones están especifi-cadas en el convenio colectivo. En ese sentido, las partes contratantes establecieron los términos que regularían la *87 manera en que el Estado podía disponer de los servicios de los empleados unionados.
Según surge del expediente, en la Declaración de Prin-cipios del Convenio Colectivo se estableció como uno de los fundamentos para llevar a cabo el acuerdo establecer un sistema de personal basado en el principio de mérito. En atención a lo anterior, el Artículo II establece lo siguiente: “Las partes intentamos en este convenio armonizar la práctica de la negociación colectiva con el sistema de personal basado en el mérito para dar cumplimiento a esta sabia política pública que reafirma la Ley de Relaciones del Trabajo para el Sector Público ...”. Véase Apéndice, Convenio Colectivo, pág. 8. Conforme a lo anterior, las par-tes se obligaron a seguir un procedimiento de cesantías basado en el principio de mérito dispuesto en el Artículo XXVII del Convenio Colectivo.(166) Conforme a lo anterior, en este caso hubo un menoscabo sustancial de la obligación contractual ya que se modificó el proceso de cesantías ba-sado en el principio de mérito, según establecido en el con-venio colectivo. Dicha obligación fue esencial para la cele-bración del acuerdo, según surge de la declaración de principios del Convenio Colectivo.
Ahora bien, el hecho de que exista un menoscabo sus-tancial a una obligación contractual no dispone de la controversia. Procede, entonces, evaluar si la modificación persigue adelantar un interés importante y si la modifica-ción, además de razonable, es necesaria para adelantar ese propósito gubernamental importante.(167)
Conforme dispone la doctrina antes expuesta, se sostendrá la validez constitucional de una legislación que menoscabe sustancialmente una obligación contractual del Estado, si dicha medida responde a un interés público importante, y es razonable y necesaria para adelantar dicho *88 propósito o interés gubernamental. Surge de la extensa Exposición de Motivos de la Ley Núm. 7 que el Gobierno del Estado Libre Asociado de Puerto Rico se encuentra en una situación de emergencia debido a una grave crisis fiscal. Para atender dicha crisis, el Estado ejerció ciertas medidas para provocar un ahorro sustancial y real en las arcas del gobierno entre las que se encuentran las cesan-tías de las recurridas.
Conforme a este estado de emergencia, el legislador de-terminó que era necesario y razonable establecer un proce-dimiento alterno para llevar a cabo las cesantías y elimi-nar los procedimientos anteriores a éstas para así poder alcanzar el propósito apremiante de la ley de manera expedita. Además, el legislador determinó utilizar exclusi-vamente el criterio de antigüedad para llevar a cabo las cesantías de modo que se garantizara una aplicación equi-tativa del criterio objetivo de antigüedad a través de todo el gobierno. Según dispone el Artículo 37.04(b)(1) de la Ley 7, supra, existe urgencia en atender y corregir los proble-mas fiscales que enfrenta el Estado de manera expedita. A tales efectos, y como citamos anteriormente, la Exposición de Motivos explica que
[t]odas las alternativas típicamente usadas como pasos pre-vios a la reducción de personal [o sea] traslados, reubicacio-nes, readiestramientos, licencias sin sueldo y de reducción de jornada, entre otros, no son viables dentro del contexto de la magnitud del déficit estructural del gobierno y la precariedad de la situación. Es necesario reducir dramáticamente y de forma expedita, el gasto gubernamental. En vista del tamaño de la nómina y del tamaño del déficit, ninguna de las demás alternativas es compatible con este objetivo o son viables ante su impacto sobre la operación del Gobierno.
Como vemos, el Estado demostró tener un interés pú-blico importante en adoptar medidas correctivas de forma expedita para atender la crisis fiscal en protección del bienestar general de la sociedad. La legislación impugnada se adoptó como resultado del ejercicio del poder de razón de *89 Estado para atender una emergencia fiscal que atenta contra el bienestar socioeconómico de la sociedad puertorriqueña.
Al evaluar la necesidad o razonabilidad de la medida para efectos de la cláusula sobre el menoscabo de obliga-ciones contractuales, aunque no procede dar completa de-ferencia al legislador, sí debemos darle alguna deferencia a la determinación de necesidad que éste hizo, por lo que no nos corresponde hacer una determinación de novo sobre la existencia de otras alternativas para la solución del problema.(168)
El legislador entendió necesario y razonable, y así lo justificó extensamente en la Exposición de Motivos de la referida Ley Núm. 7, suspender temporeramente aquellas disposiciones contractuales, reglamentarias o estatutarias que establecieran procedimientos y criterios para llevar a cabo las cesantías de empleados que contravinieran lo dis-puesto por la Ley Núm. 7. La Asamblea Legislativa llegó a esta conclusión porque “las alternativas típicamente usa-das como pasos previos a la reducción de personal” conlle-van “traslados, reubicaciones, readiestramientos, licencias sin sueldo y de reducción de jornada, entre otros, que no son viables dentro del contexto de la magnitud del déficit estructural del gobierno y la precariedad de la situación”. Era necesario establecer un procedimiento de cesantías que lograra reducir el gasto gubernamental dramática-mente y de forma expedita, para lograr la consecución del interés público del Estado de atender con premura la crisis fiscal.
De igual modo, es totalmente razonable y necesario que el legislador estableciera un criterio objetivo como lo es el de antigüedad en el empleo, de modo que se garantizara una aplicación equitativa del procedimiento de cesantías a través de todo el gobierno. Además, es meritorio señalar que la legislación impugnada es producto de una situación *90 de emergencia y la suspensión de las disposiciones de los convenios que no sean conformes a la referida Ley Núm. 7 es temporera. Véase Arts. 37.04(a) y 38.02(b) de la Ley Núm. 7, supra. Estos factores abonan a la determinación de razonabilidad de la medida.
Por último y como ya hemos determinado, debemos re-cordar que las recurridas no quedaron desprovistas de un procedimiento de cesantías que les garantizara un debido proceso de ley. Aunque, en efecto hubo una modificación de la obligación, el Estado les proveyó un procedimiento de cesantías y de revisión, garantizándoles así un debido pro-ceso de ley.
Conforme a lo anterior, resolvemos que las cesantías y el procedimiento establecido por la Ley Núm. 7 no infrin-gen la cláusula que prohíbe el menoscabo de las obligacio-nes contractuales.
X

Delegación indebida de poder

A. Como señalamos en el recurso CT-2009-09, la parte recurrida argumenta que el Art. 37.04(b)(5),(6) y (7) de la Ley Núm. 7, supra, delega a la J.R.E.F. unos poderes sin guías claras que ocasionan una concentración indebida de poderes en dicho organismo. Sostiene que la Ley Núm. 7 confiere a la J.R.E.F. la facultad de tomar todas las accio-nes necesarias para que se dé cumplimiento a la ley sin establecer normas que limiten esa facultad. También aduce que el Art. 41 y 42 de la antedicha ley le concede a la J.R.E.F. la autoridad para realizar traslados y subcontra-tación de labores sin unas guías que orienten la utilización de ese poder delegado. A su vez, la parte recurrida apunta que el Art. 68 de la Ley Núm. 7 hace una delegación de poder indebida al Gobernador que viola la separación de poderes. No le asiste la razón.
En Puerto Rico existe un sistema republicano de *91 gobierno que está compuesto por tres ramas de gobierno: la Legislativa, la Judicial y la Ejecutiva.(169) Así, los poderes delegados por el pueblo al Gobierno, a través de la Consti-tución, se distribuyen de manera tripartita. Esa separa-ción de poderes es la salvaguarda que nuestra Constitu-ción consagra para preservar las libertades del Pueblo y un sistema democrático de Gobierno.(170) Sin embargo, cada uno de estos poderes, aunque soberano e independiente respecto al ejercicio del poder conferido, interrelaciona con los otros manteniendo íntegra la autoridad de cada cual.(171)
La doctrina de separación de poderes se asienta sobre el principio de que el poder se delega en las tres ramas de gobierno para evitar la concentración de poderes en una sola rama, o el abuso de poder de parte de otra.(172) Así, una rama de gobierno no puede usurpar o apropiarse de facultades de otra rama sin ocasionar daño.(173) “La existencia de tres poderes coiguales genera necesariamente tensión y fricción entre las ramas, que se aminora mediante un sistema de pesos y contrapesos, que permite calibrar el fino equilibrio en el ejercicio del poder, según lo ordena la Constitución”.(174)
El principio axiomático de separación de poderes repre-senta el andamiaje de la concepción purista constitucional, que predica que el poder que la Constitución les reconoce a las fiamas del Gobierno es exclusivo de éstas y por lo tanto no puede ser delegado a otras entidades administrativas. “Lo fundamental de esta postura es el carácter exclusivo *92 que se le adscribe a los poderes conferidos a cada rama de gobiemo”.(175) Bajo esta filosofía, la doctrina de la separa-ción de poderes le niega validez constitucional a las agen-cias o entes administrativos, ya que éstas ejercen poderes exclusivos de las Ramas del Gobierno. (176) En fin, esta vi-sión no refrenda la delegación de poderes legislativos, ju-diciales o ejecutivos a un organismo administrativo.
Ese fundamentalismo constitucional fue el que imperó en Estados Unidos durante sus inicios históricos.(177) Así, ante el interés de delegar poderes a las agencias adminis-trativas, la primera reacción judicial fue denegar la posibi-lidad de que el Congreso federal pudiera delegar su poder legislativo.(178) No obstante, el desarrollo de la moderna economía industrial y el período de la crisis de la Gran Depresión Económica, pusieron de manifiesto la necesidad de delegar poder a las agencias administrativas —cuya creación se hizo cada vez más necesaria— para combatir la crisis económica que aquejaba a Estados Unidos de América.(179) Esa coyuntura requirió utilizar una forma más ágil de establecer parámetros y normas suficientes. De esa manera, ya para 1928 afloraba la nueva postura judicial en torno a la doctrina de delegación de poderes en Estados Unidos. Así, en el caso Hampton Co. v. United States, 276 U.S. 394 (1928), ocurrió una transmutación en la concepción puritana constitucional, al sostenerse por el máximo Foro federal, que la delegación de poderes es per-misible si se hace a través de un principio inteligible que guíe la autoridad de la agencia. (180)
En la actualidad, tanto en la jurisdicción federal *93 como en nuestra jurisdicción estatal, es incuestionable la validez de la delegación siempre y cuando la ley habilita-dora que crea la agencia u organismo administrativo, esta-blezca normas adecuadas, pautas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actua-ciones de los entes administrativos resulten arbitrarias o caprichosas.(181) Dichos criterios no tienen que ser expre-sos, pueden surgir, inclusive, del historial legislativo y pue-den ser amplios y generales; si tiene un fin o interés pú-blico, por lo general es suficiente justificación para que se sostenga la delegación.(182) Desde Luce & Co. v. Junta de Salario Mínimo, 62 D.P.R. 452 (1943), “[s]e desprende ... la necesidad de que se delegue a funcionarios y juntas admi-nistrativas gran parte del poder que la legislatura podría ejercitar ...”.(183) Sobre esa necesidad de delegar este Tribunal ha expresado:
[E]l mundo moderno se caracteriza por la gran complejidad en las relaciones sociales y económicas de las personas, conjunta-mente con la progresiva supervisión gubernativa sobre la con-ducta individual, y ello implica que la legislatura está imposi-bilitada de anticipar legislativamente, en forma detallada, minuciosa o específica, la multiplicidad de situaciones que puedan surgir de esas relaciones complejas, siendo suficiente en que la ley en cuestión señale o establezca normas amplias y generales que sirvan de guía o dirección a entidades adminis-trativas expertas, para que éstas, con su experiencia y conoci-mientos especiales, apliquen esas normas concretamente a los hechos que puedan surgir y ultimen los detalles que imple-menten la política general legislativa.(184)
*94 De esta manera, nada impide que la Legislatura esta-blezca normas generales que sean amplias y que dejen al administrador un adecuado margen de libertad para com-plementar las normas legislativas mediante la utilización de un juicio especializado, que se pueda desarrollar con-forme a un análisis, apreciación y discreción administra-tiva que tenga una base de razonabilidad.(185)
Con el marco normativo esbozado, procedemos a resolver los planteamientos sobre delegación de poderes ex-puestos por la parte recurrida en el recurso CT-2009-9.
B. La J.R.E.F. está definida en el Art. 33(f) de la Ley Núm. 7, supra, como la Junta de Restructuración y Estabilización Fiscal. Esta fue creada al amparo del Art. 37.04(b)(5) de la consabida ley para hacer cumplir los objetivos del Capítulo 3 de ésta.(186) Además, a dicha junta se le encomienda tomar todas las acciones necesarias para el cumplimiento de la susodicha ley.(187) Se desprende pues de la Ley Núm. 7 que la J.R.E.F. es una junta que fue creada para facilitar el cumplimiento de dicha ley. En ese sentido, se le delegó por la Legislatura parte del poder más elemental que la Constitución del Estado Libre Asociado de Puerto Rico le reconoce a la Rama Ejecutiva: hacer cumplir la ley.(188)
Por su parte, el Art. 37.04(b), antes citado, establece claramente que las facultades que se le delegan a la J.R.E.F y que están relacionadas a las cesantías de los empleados públicos, deben guiarse y regirse por el criterio de antigüedad. Es decir, la J.R.E.F. tendrá todas las facultades necesarias y convenientes encaminadas al cumplimiento de la Ley Núm. 7, pero en materia de cesantías, siempre estará obligada a respetar el criterio de *95 antigüedad. En ese sentido, la propia ley establece una li-mitación a las potestades que pueda tener la J.R.E.F. al descargar sus funciones.
A su vez, la Ley Núm. 7 provee unas guías ilustrativas que enmarcan las prerrogativas de dicha junta. Así por ejemplo, el inciso sexto del Art. 37.04(b) establece que la J.R.E.F. podrá realizar estudios necesarios o encomendar-los a las agencias que estén a su cargo, requerir informa-ción necesaria para llevar a cabo su encomienda, asesorar al Gobernador y a las agencias con relación a los emplea-dos cesanteados, aprobar, rechazar y evaluar peticiones de los empleados para reducir la jornada de estos, reunirse con los jefes de agencias, etc. Aun si concluyéramos que los criterios que la Ley Núm. 7 reconoce a la J.R.E.F. son am-plios y generales, no cabe duda de que tales criterios tienen un fin o interés público bien delimitado.(189) Como ya seña-lamos, ese interés público es suficiente para sostener la delegación.(190)
Igualmente y como ya hemos dicho, la Ley no deja des-provisto al empleado público pues éste tiene un procedi-miento a su haber para impugnar la determinación de la J.R.E.F o de la agencia pertinente. Por tal razón, las deci-siones que tome la J.R.E.F. no son infalibles y pueden ser objeto de impugnación por parte de un empleado que en-tienda que su despido no fue conforme al criterio de antigüedad. Esa facultad que se le reconoce al empleado, correlativamente, guía la discreción de la J.R.E.F. ya que le impone como deber ejercer propiamente las facultades que la ley le delega para evitar que sus acciones sean impug-nadas e invalidadas por un tribunal.
Por otro lado, los Arts. 41 y 42 de la Ley Núm. 7, supra, le conceden a la J.R.E.F la facultad de realizar traslados y subcontratación de empleados de manera flexible:
*96 Artículo 41 — Traslados
Durante las Fases I, II y III de este Capítulo III, y con el fin de asegurar la continuidad y calidad de los servicios guberna-mentales, la JREF podrá autorizar traslados de empleados en-tre puestos, clases y niveles de puestos, grupos de empleados, unidades apropiadas, de unidades sindicales a no sindicales y viceversa, en una misma Agencia o entre Agencias; disponién-dose, que el empleado trasladado deberá cumplir con los requi-sitos mínimos de preparación académica y experiencia necesa-ria para ocupar el puesto. El empleado trasladado estará sujeto al período probatorio requerido para el puesto. Quedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio, acuerdo o precepto que sea contrario a lo indicado en este Capítulo III; disponiéndose, que existirá total flexibilidad para realizar los traslados.
Artículo 42 — Subcontratación
Durante las Fases I, II y III de este Capítulo III, y con el fin de asegurar la continuidad y calidad de los servicios guberna-mentales, la JREF podrá autorizar la transferencia y subcon-tratación de labores realizadas por empleados, unidades apro-piadas o unidades sindicales.
Quedará en suspenso, durante la vigencia de las Fases I, II y III, toda aquella disposición de ley, reglamento, convenio o precepto contrario a lo indicado en este Capítulo III.
En todo contrato otorgado por las Agencias conforme a este Artículo se le requerirá al contratista que, en la prestación de los servicios contratados, emplee empleados cesanteados dis-ponibles, que tengan la preparación y experiencia necesaria para prestar el servicio contratado, conforme a la lista de can-didatos a reempleo que habrá de preparar la ORHELA a tenor con lo dispuesto en el Artículo 43 de este Capítulo III. (Enfasis suplido.)
Se desprende de ambos artículos que los empleados de-berán tener la preparación y experiencia necesaria para ocupar el puesto, si es un traslado, o para prestar el servi-cio contratado en casos de subcontratación. Además, am-bas disposiciones establecen como parámetros, que la fa-cultad que se le delega a la J.R.E.F. está subordinada al objetivo de asegurar la continuidad y calidad de los servi-cios gubernamentales. De esa manera, la J.R.E.F. siempre tendrá que justificar el traslado o la subcontratación. Es decir, la J.R.E.F. está limitada a subcontratar o trasladar *97 aquel empleado que tenga la preparación y experiencia ne-cesaria para ocupar el puesto o para prestar el servicio requerido, y que además, ayude a evitar una interrupción o paralización en los servicios.
Nuevamente, la discreción de la J.R.E.F. tiene que guiarse por el propósito e interés público primordial de la Ley Núm. 7, que es atender la emergencia y crisis fiscal que impera sobre el Gobierno de Puerto Rico. Así, la enco-mienda principal de la J.R.E.F. es buscar la manera de reducir el déficit estructural, y a la vez, velar porque la prestación de los servicios gubernamentales no se afecte. Para lograr ese objetivo la Ley Núm. 7 le permite trasladar empleados públicos y subcontratar.
Por todo lo anterior colegimos, que la delegación de po-der que la Legislatura le hace a la J.R.E.F. —en cuanto a subcontratación y traslado— es constitucionalmente válida y no viola el principio de separación de poderes al proveer unas guías adecuadas que orientan la utilización de ese poder.
Finalmente, la parte recurrida alega que el Art. 68 de la Ley Núm. 7, supra, le delega indebidamente poder al Gobernador de Puerto Rico en violación al principio de separación de poderes. Dicho artículo dispone:
Se faculta al Gobernador para tomar toda medida que sea necesaria y conveniente, además de aquellas provistas por esta Ley, para que mediante Orden Ejecutiva reduzca los gas-tos; promueva la economía de la Rama Ejecutiva hasta el máximo compatible con el funcionamiento eficiente del Go-bierno; mantenga la eficiencia de las operaciones de la Rama Ejecutiva en el mayor grado posible; y agrupe, coordine y con-solide funciones en cada Agencia; todo ello de acuerdo con los objetivos de esta Ley. Disponiéndose, no obstante, que el Go-bernador no podrá crear, consolidar o reorganizar departa-mentos ejecutivos, ni suprimir organismos creados por Ley. Aquellas reorganizaciones que requieran legislación o enmien-das a estatutos vigentes, deberán ser presentadas ante la Asamblea Legislativa para su consideración.
Las facultades concedidas bajo esta Ley no limitan toda aquella otra que el Gobernador pueda tener y tomar, de no *98 lograrse el objetivo fijado por el Artículo 33(g). Art. 68 de la Ley Núm. 7, supra.
En primer lugar, debemos señalar que la Constitución del Estado Libre Asociado de Puerto Rico establece que entre los deberes, atribuciones y funciones del Gobernador se encuentran: “[c]umplir y hacer cumplir las leyes”; “[e]jercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley”.(191) Como corolario de lo anterior, se ha interpretado que una orden ejecutiva encuentra apoyo legal en la facultad general del Primer Ejecutivo de cumplir y hacer cumplir las leyes.(192) Así, la facultad del Gobernador de emitir órdenes ejecutivas emana de los poderes que le confieren las leyes o de los poderes inherentes a su cargo.(193) Asimismo, toda orden ejecutiva enmarca un mandato que va dirigido a los organismos gubernamentales de la Rama Ejecutiva.
Por eso, al permitirle al Gobernador emitir órdenes ejecutivas, el Art. 68 de la Ley Núm. 7, supra, no hace sino conferirle la prerrogativa de ejercitar un poder constitucionalmente válido. Cabe apuntar, que el Gobernador de Puerto Rico tiene la facultad para ejercer la dirección general de la administración pública con el claro entendimiento de que comprende la supervisión e inspección de los departamentos y agencias de gobierno de la Rama Ejecutiva así como de las corporaciones públicas y de ciertas entidades autónomas creadas por ley.(194) Además, “[n]uestra Constitución ... adoptó un Poder Ejecutivo unitario al investir a un solo funcionario ... con la autoridad suprema en la Rama Ejecutiva ‘sin limitaciones de nin- *99 guna clase’ ”,(195) que no sean las que dispone la propia Constitución y las leyes que a su amparo se aprueben.
De otra parte, el Art. 68 de la Ley Núm. 7, supra, per-mite al Primer Mandatario emitir órdenes ejecutivas con-ducentes a: reducir gastos, promover hasta al máximo po-sible la economía de la Rama Ejecutiva sin que se afecte el funcionamiento eficiente del Gobierno, mantener la eficien-cia de las operaciones de la Rama Ejecutiva en el mayor grado posible, y agrupar, coordinar y consolidar funciones en cada Agencia de acuerdo a los objetivos de la ley. Surge claramente del susodicho artículo, que las facultades del Primer Mandatario se deben gobernar bajo dos principios esenciales: (1) deben promover los objetivos de la Ley Núm. 7; (2) y en consonancia con ese parámetro, no puede afectar el funcionamiento eficiente del Gobierno. Es decir, la dele-gación de poder que se le despliega al Ejecutivo se regenta por principios diáfanamente establecidos. A su vez, el pro-pio Art. 68 de la Ley Núm. 7, supra, reconoce una limita-ción adicional al poder del Gobernador. Éste no podrá crear, consolidar o reorganizar departamentos ejecutivos, ni suprimir organismos creados por Ley; las reorganizacio-nes que requieran legislación o enmiendas a estatutos vi-gentes, deberán ser presentadas ante la Asamblea Legisla-tiva para su consideración. (196) Lo anterior es un claro ejemplo de que las facultades del Primer Ejecutivo al am-paro de la antedicha ley, encuentren sus límites ante las prerrogativas de la Asamblea Legislativa de formular y crear las leyes.
En conclusión, las facultades que les reconoce el Art. 68 de la Ley Núm. 7, supra, al Gobernador, no son una dele-gación impermisible o indebida de poder. Tales facultades se circunscriben a la Rama Ejecutiva y en ningún momento develan la intención legislativa de claudicar a sus poderes constitucionales de legislar. Por lo tanto, no podemos re- *100 frendar los argumentos de la parte recurrida a los efectos de que la Ley Núm. 7 delega indebidamente poder al Gobernador.
XI
Por todo lo anterior, resolvemos que la Ley Núm. 7 de 9 de marzo de 2009, conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, es constitucional, en todos los aspectos cubiertos por esta opinión. Como consecuencia, y en vista de que las par-tes recurridas no ostentan un derecho en ley que requiera hacerse efectivo;(197) se declara “No Ha Lugar” la solicitud de injuction permanente.

Se devuelve el recurso CT-2009-09 al Tribunal de Pri-mera Instancia, Sala de San Juan, para la continuación de los procedimientos de forma compatible con esta opinión.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Martínez Torres y la Jueza Aso-ciada Señora Pabón Charneco se acogen al término regla-mentario de diez días que se dispone en la Regla 5 de nues-tro Reglamento, 4 L.P.R.A. Ap. XXI-A, para reservarse el derecho de emitir una opinión de conformidad, luego de examinar las ponencias disidentes que no se circularon, en violación de nuestro Reglamento. El Juez Presidente Señor Hernández Denton, la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez emitieron sendas opiniones disidentes. El Juez Asociado Señor Rivera Pérez emitió un voto particular.
*101 — O —

 A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903, 907 (1975), citando con apro-bación a Pound, Jurisprudence, T. III, pág. 235 et seq.

 Durante el trámite procesal de los casos CT-2009-5 y CT-2009-6 se nos peti-cionó la consolidación de los mismos con el CT-2009-4. Este Tribunal denegó el peti-torio por entender que atrasaría la resolución del caso. No obstante, ante el trámite expedito seguido en los otros recursos y en aras de la economía procesal, consolida-mos en esta opinión los recursos CT-2009-4, CT-2009-5, CT-2009-6 y CT-2009-9.

 En el caso CT-2009-4: las Sra. Olga Domínguez Castro se desempeña como Técnico de Sistemas de Oficina del Departamento de Justicia, desde hace diez años y unos meses; la Sra. Sandra J. Guzmán también labora para el Departamento de Justicia pero como Oficinista Entrada de Datos, desde hace diez años; la Sra. Militza López Mateo funge como Contador IV del Departamento de la Familia desde hace siete años, y el Sr. Carlos R. Rivera Figueroa trabaja igualmente para el Departa-mento de la Familia, pero como Técnico de Presupuesto III, desde hace ocho años.
En el caso CT-2009-5: Durante el trámite del caso ante este Foro los recurridos instaron una Moción de Desistimiento Parcial sin Perjuicio. Plantearon que las cir-cunstancias de varios de los recurridos había cambiado y que se les había informado que estaban en el grupo que continuarían laborando. En consecuencia, peticionaron el desistimiento sin perjuicio de dichos empleados. El peticionario presentó oposición. Declaramos “Ha Lugar” el petitorio de los recurridos en cuestión.
A tales efectos, los recurridos que permanecen en el pleito son: el Sr. Luis Ramos Comas, Inspector de Tiendas de Instituciones Penales de la Administración de Co-rrección desde hace nueve años y dos meses; la Sra. Ivelisse Marrero Marcano, Es-pecialista de Recursos Humanos desde hace más de ocho años labora para la Admi-nistración de Servicios de Salud Mental y Contra la Adicción; la Sra. Mirys Rodríguez Jiménez, Auxiliar de Sistema de Oficina II del Departamento de Recrea-ción y Deportes desde el 6 de noviembre de 2003; la Sra. Leemaris Rodríguez Aponte, Especialista Administrativa Humana I hace más de siete años para la Administra-ción de Corrección,; la Sra. Yarigna Leslie Osorio Santiago, Analista de Presupuesto II en el Departamento de Recreación y Deportes hace más de seis años; la Sra. Ruth Daisy Fontanez Sánchez, Administradora de Sistema de Oficinas para la Adminis-tración de Corrección desde el 8 de junio de 2002; la Sra. Ruth Evelyn Rivera Rosario, Auxiliar Administrativo I en el Departamento de Recursos Humanos hace más de doce años; el Sr. Nelson Guzmán Algarín, Oficinista en el Departamento de la Vivienda desde hace más de seis años; la Sra. Luz C. León Rivera, Auxiliar Adminis-trativo I para el Departamento de la Educación desde hace más de trece años; Oscar E. Luna Ugarte, Conseije en el Departamento de Educación más de siete años; Biterbo Caldero Pérez, Empleado de Custodia I (Conseije) en el Departamento de Edu-cación; la Sra. Mireille Rodríguez Rodríguez, Auxiliar Administrativo I del Departa-mento de Educación hace más de cinco años.
*17 En el caso CT-2009-6: la Sra. Zoraida Martínez Román, la Sra. Saudy Leilany Hernández Colón y la Srá. Jesenia Ayala Maldonado, empleadas de la Administra-ción para el Sustento de Menores desde hace más de seis, doce y siete años, respectivamente. Estas empleadas son unionadas.
En el caso CT-2009-9: la Sra. Erika Vispo Figueroa, Técnica de Sistema de Oficina para la Oficina Compensación de Víctimas de Delito, adscrita al Departa-mento de Justicia, desde hace siete años y siete meses.

 El Art. 37.03(b)(5) de la Ley Núm. 7 establece que la JREF estará compuesta por el Presidente del B.G.F. (el cual dirigirá la Junta), el Secretario del Trabajo, el Secretario del Departamento de Desarrollo Económico y Comercio de Puerto Rico, el Secretario del Departamento de Hacienda y la Directora Ejecutiva de la OGP Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que reciben por el desempeño de sus labores en sus agencias o departamentos.

 El Art. 37.04(b)(4) de la Ley Núm. 7 señala que “[a] los fines de determinar la antigüedad de empleados afectados se considerarán todos los servicios prestados por los empleados afectados en el servicio público, independientemente de las disposicio-nes de los convenios colectivos, reglamentos, cartas circulares y otros documentos normativos”.

 En el CT2009-4 la demanda fue instada el 9 de octubre de 2009; en el CT-2009-5 el 13 de octubre de 2009, en el CT-2009-6 el 21 de octubre de 2009 y en el CT-2009-9 el 6 de noviembre de 2009.

 La demanda en el CT-2009-4 incluye como partes demandadas al Gobernador de Puerto Rico, Hon. Luis G. Fortuño, al Departamento de Justicia, al Departamento de la Familia y a la Junta de Reestructuración y Estabilización Fiscal; en el CT-2009-5 la parte demandada es el Gobernador de Puerto Rico, Hon. Luis G. Fortuño y el Estado Libre Asociado y en el CT-2009-6 los demandados son el Estado Libre Asociado, el Departamento de la Familia y la Administración para el Sustento de Menores. En el CT-2009-9 las partes demandadas son el Gobierno del Estado Libre Asociado de Puerto Rico, la Junta de Reestructuración Fiscal y Estabilización Fiscal y el Departamento de Justicia.

 En el recurso CT-2009-6 el peticionario solicitó prórroga para someter un escrito de réplica al alegato, el cual, en aras de la economía procesal, declaramos “N/H/L”.

 Por el efecto de lo que se solicitaba, acogimos tal solicitud de orden provisional en auxilio de jurisdicción como si fuera una solicitud de “injuction” preliminar, declarándola “no ha lugar” por no cumplir con los requisitos de tal recurso extraordinario.

 Ley Núm. 184 de 3 de agosto de 2004, según enmendada, conocida como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. see. 1461 et seq.

 En el CT-2009-09 la parte recurrida también alegó que la Oficina de Com-pensación a Víctimas de Delito adscrita al Departamento de Justicia, que es donde labora, está excluida de la aplicación de la Ley Núm. 7. Sin embargo, los méritos de ese planteamiento deben ser dilucidados en el foro de instancia. Nótese que este Tribunal acogió el recurso de certificación para resolver las impugnaciones relacio-nadas a la constitucionalidad de la susodicha ley. Por lo tanto, todos los asuntos que no comprendan la constitucionalidad de la Ley Núm. 7 deberán ser atendidos por el Tribunal de Primera Instancia a no ser que estén relacionados a la antigüedad del empleado público afectado, en cuyo caso será CASARH o la Comisión de Relaciones del Trabajo de Servicio Público los foros con juisdicción para atender tal reclamo de forma primaria.

 Esta ley cuenta con un extenso Informe Conjunto, emitido por las Comisiones de Hacienda y de Gobierno de la Cámara de Representantes. Las Comisiones de Hacienda y de Gobierno celebraron vistas públicas sobre la medida el 5 de marzo de 2009, en la que participaron el Presidente del Banco Gubernamental de Fomento, la Directora de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda, el Secretario del Trabajo y Recursos Humanos, la Subsecretaría del Departamento de Justicia, los economistas Juan Lara y Vicente Feliciano, y representación del sector sindical del país.

 El Art. 37.02 de esta Ley excluye de su aplicación a los empleados públicos siguientes: policías y bomberos; oficiales de corrección y oficiales juveniles; maestros asignados al salón de clases; bibliotecarios de escuelas; profesionales de la salud (médicos, paramédicos, enfermeras, farmacéuticos y técnicos de laboratorio); traba-jadores sociales; operadores del sistema de llamadas de emergencia 911, y patólogos del Instituto de Ciencias Forenses. Además, surge de su Exposición de Motivos que estarán exentas del plan para la reducción de la nómina gubernamental, la Rama Judicial, las corporaciones públicas, la Universidad de Puerto Rico, la Comisión Es-tatal de Elecciones y la Oficina de Etica Gubernamental.

 Véanse: Exposición de Motivos y Art. 37.03(b)(3) de la Ley Núm. 7.

 El Art. VI, Sec. 8 de nuestra Constitución establece lo siguiente:

“Sección 8. Prioridad de desembolsos cuando recursos no basten.

“Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de *22 intereses y amortización de la deuda pública, y luego se harán los demás desembol-sos de acuerdo con la norma de prioridades que se establezca por ley.” Art. VI, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1; ed. 2008, pág. 428.

 El Art. VI, Sec. 7 de nuestra Constitución establece lo siguiente:
“Sección 7. Asignaciones no excederán de los recursos.
“Las asignaciones hechas para un año económico no podrán exceder de los re-cursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.” Art. VI, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 428.

 Esta ley no sólo dispone para la reducción de los gastos gubernamentales, sino que establece una serie de contribuciones y/o créditos a individuos (Art. 4), contribuciones a productos (cigarrillos, Art. 5); a vehículos de motor (Art. 6) y a licores, vinos y cervezas (Art. 14).

 Art. 2 de la Ley Núm. 7.

 Las Secs. 18 y 19 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, en lo pertinente, señalan:

“Sección 18. Derecho a la huelga, a establecer piquetes, etc.

"... Nada de lo contenido en esta sección menoscabará la facultad de la Asam-blea Legislativa de aprobar leyes para casos de grave emergencia cuando estén cla-ramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales. Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 377.

“Sección 19. Interpretación liberal de los derechos del ser humano y facultades de la Asamblea Legislativa.

“La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la fa-cultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo.” Art. II, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 379.

 Específicamente, el Art. 36.01 señala que todo empleado de las agencias a las que les aplique el Cap. Ill y que tenga veinte años o más de empleo en el servicio público, sería elegible para el programa, el cual constaría de la reducción de una jornada regular diaria del empleado en cada quincena, es decir, un día en cada quincena. (Art. 36.01(a) y (b) de la Ley Núm. 7). El referido artículo también advierte que la reducción de jornada dispuesta, al igual que la consecuente reducción en paga, serán de carácter permanente. (Art. 36.01(e) de la Ley Núm. 7.)
El Art. 36.02 establece el Programa de Renuncias Voluntarias Incentivadas, cuyo proceso de implementation y notificación estará a cargo de la Oficina de Geren-cia y Presupuesto (OGP). Éste acoge a todo empleado de las agencias a las que le es *25 aplicable el Capítulo III, pero señala un término improrrogable de 30 días para poder acogerse, contados a partir de la notificación de la OGP. Este artículo establece un incentivo económico que consiste del pago de una cantidad monetaria, basado en el término de empleo en el servicio público del empleado. Este incentivo es libre en el pago de contribuciones sobre ingresos, y de descuentos por ahorros y aportaciones a los sistemas de retiro de los empleados gubernamentales, o de contribución sobre ingresos. Además, el empleado recibe, conjuntamente con el pago de sus días por vacaciones a liquidarse en el término plazo de 30 días, el pago de la prima de cober-tura médica por un término máximo de doce meses o hasta que éste sea elegible para cobertura de seguro de salud en otro empleo. (Art. 36.03(a), (b) y (c) de la Ley Núm. 7.)

 Este artículo también excluye, entre otros, a los empleados de confianza. Art. 37.02 de la Ley Núm. 7.

 Esto, además de la liquidación de vacaciones regulares. Asimismo, para aquellos empleados elegibles para ello, también les corresponde una liquidación por licencia por enfermedad y por tiempo extraordinario acumulado. Tales beneficios se resumen de la siguiente manera: pago de la prima de cobertura médica por un tér-mino ininterrumpido de seis meses o hasta que éste sea elegible para cobertura de seguro de salud en otro empleo; serán considerados elegibles al Programa de Alter-nativas para Empleados Públicos según dispuesto en el Art. 39 de la propia ley, y podrán elegir que se les liquide lo acumulado como beneficio de retiro, o se les trans-fiera, o se adopte cualquier otra alternativa de las dispuestas por, y en conformidad con la ley que regula su retiro, su reglamento y/o el plan correspondiente.

 Estas alternativas no consisten en pagos o beneficios directos al empleado, sino que éstos serán tramitados o canalizados a la institución educativa, vocational técnica o al nuevo patrono de éste, sujeto a las directrices que establezca la J.R.E.F. a esos efectos. Las alternativas son las siguientes: un vale educativo por una canti-dad de $5,000 dólares; un vale vocacional/téenico o para relocalización por una can-tidad total de $2,500, o un subsidio de 50% del salario de transición a un empleo en el Sector Privado o en el Tercer Sector aplicable a un salario bruto de hasta un máximo de $30,000. Por lo tanto, el beneficio máximo a concederse en virtud de este inciso es de $15,000.

 La aplicación de tal registro se da en la circunstancia de que, “[s]i al im-plantarse la Fase II existiere la necesidad de llenar una posición vacante, y esto no pudiera lograrse mediante traslado, se podrá reemplear a aquellos que figuran en el registro de elegibles y que al momento de su despido estaban desempeñando labores iguales o similares a las del puesto vacante, siguiendo para ello el criterio de antigüedad. En estos casos se reempleará a estos empleados dándole preferencia a los de mayor antigüedad”. Art. 44(b) de la Ley Núm. 7, supra.

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296.

 Véase Emda. V, Const. EE. UU., L.P.R.A., Tomo 1, ed. 2008, pág. 189.

 Véase Emda. XIV, Const. E.E. U.U., L.P.R.A., Tomo 1, ed. 2008, pág. 206.

 Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 273 (1987).

 Torres Solano v. P.R.T.C., 127 D.P.R. 499 (1990).

 M. Velázquez Rivera, Validez legal de la reglamentación por la Asamblea Legislativa de la importación, venta y posesión en Puerto Rico de perros de la raza Pit Bull, 63 (Núm. 1) Rev. Jur. U.P.R. 1, 15 (1994).

 Bordas & Co. v. Srio. de Agricultura, 87 D.P.R. 534, 547-548 (1963), citando a Barbier v. Connolly, 113 U.S. 27, 31 (1885); Brown v. Maryland, 12 Wheaton 419, 442 (1827); Weaver, Constitutional Law (1946), pág. 491.

 Véase El Pueblo v. López, 28 D.P.R. 377, 380 (1920).

 (Reiterando el criterio expuesto en la Opinión del Secretario de Justicia Núm. 1966-40.) Op. Sec. Just. Núm. 33 de 1984.

 R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 923.

 Vélez v. Municipio de Toa Baja, 109 D.P.R. 369 (1980).

 Véase Arenas Procesadas, Inc. v. E.L.A., 132 D.P.R. 593 (1993).

 Cervecería Corona, Inc. v. Srio. Obras Públicas, 97 D.P.R. 44 (1969). Esto en el contexto del poder de la Asamblea Legislativa para la eliminación sumaria de rótulos y anuncios instalados en violación a las leyes y reglamentos de zonifícación.

 Village of Belle Terre v. Boraas, 416 U.S. 1 (1974). Véase, también, Penna. Coal Co. v. Mahon, 260 U.S. 393, 413 (1922).

 Defendini Collazo et al. v. E.L.A., Cotto, 134 D.P.R. 28, 74 (1993). Véanse, además: Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 80 (1983); E.L.A. v. Márquez, 93 D.P.R. 393, 402 (1966).

 J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 629.

 Serrano Geyls, op. cit., págs. 915-916, 925-926 y 930. En el caso Lochner v. New York, 198 U.S. 45 (1905), la Corte de Apelaciones de Nueva York había confir-mado la condena del demandante (Lochner), quien había violado una ley de ese estado que prohibía el empleo de panaderos por más de sesenta horas a la semana o diez horas al día. El Tribunal Supremo federal declaró inconstitucional esa ley al considerar que era una irrazonable, innecesaria y arbitraria, y que interfería con la libertad de contratación, sin tener el gobierno un propósito legítimo para regular las condiciones y prácticas de trabajo. Este caso marcó un periodo de casi treinta años que se conoció como la “era Lochner”.
Por otra parte, en West Coast Hotel Co. v. Parrish et al., 300 U.S. 379, 398 (1937), el Tribunal Supremo federal aplicó la doctrina jurisprudencial sentada en Nebbia, supra, y señaló que: “[si l]as regulaciones a la propiedad privada ... guardan una relación razonable con un legítimo fin legislativo, y no son discriminatorias o arbitrarias, los requerimientos del debido proceso se encuentran satisfechos ... los tribunales son incompetentes para controlarlas si resulta adecuada y practicable ... no puede ser invalidada salvo que el exceso legislativo sea palpable.” (Traducción nuestra.)

 Álvarez González, op. cit., págs. 631-632.

 Marina Ind., Inc. v. Brown Boveri Corp., supra, pág. 80. Véase, además, Morales v. Lizarribar, 100 D.P.R. 717 (1972); Central San Vicente v. Junta Azucarera, 78 D.P.R. 799 (1955); A. Roig, Sucrs. v. Junta Azucarera, 77 D.P.R. 342, 357 (1954).

 Defendini Collazo et al. v. E.L.A., Cotto, supra, pág. 74.

 Salas v. Municipio de Moca, 119 D.P.R. 625, 633 (1987); Morales v. Lizarribar, supra.

 Defendini Collazo et al. v. E.L.A., Cotto, supra, pág. 74.

 Marina Ind., Inc. v. Brown Boveri Corp., supra, pág. 81. Véanse, además: Hermina González v. Srio. del Trabajo, 107 D.P.R. 667, 673 (1978); Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).

 Véanse, también, Berberena v. Echegoyen, 128 D.P.R. 864, 881-882 (1991); Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985); Schweiker v. Wilson, 450 U.S. 221 (1981); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981).

 Marina Ind., Inc. v. Brown Boveri Corp., supra, pág. 80.

 B. Biondi, La ciencia del Derecho como arte de lo justo, 9 Anales de la Academia Matritense 323, 352 (1957), citado por el Juez Asociado Señor Negrón García en su opinión concurrente en Pueblo Int’l, Inc. v. Srio. de Justicia, 122 D.P.R. 703, 748 (1988).

 Santiago v. Jones, 74 D.P.R. 617, 621-622 (1953).

 Véase Torres Solano v. P.R.T.C., supra, pág. 519 (1990).

 A.E.E. v. U.T.I.E.R., 153 D.P.R. 623, 630 (2001); Marrero Caratini v. Rodríguez Rodríguez, 138 D.P.R. 215, 221 (1995); Torres Solano v. P.R.T.C., supra.

 Además de su título, Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, la Ley Núm. 7 declara la existencia de un “estado de emergencia fiscal” en su Exposición de Motivos; un “estado de emergencia económica y fiscal” en el Art. 2 (“Declaración de Propósito de Política Pública”), y, nuevamente, un “estado de emergencia fiscal” en el Art. 37.04(b) (“Cesantías”).

 Podríamos encontrar un tipo de excepción a esta aseveración en dos leyes que se aprobaron en la década de los años 40, como consecuencia de la situación mundial provocada por la Segunda Guerra Mundial. Sin embargo, ninguna de estas leyes abarcaba la magnitud —tanto en las áreas afectadas como en sus implicacio-nes— de la Ley Núm. 7.
A continuación, hacemos un muy breve resumen de las leyes en las que ante-riormente la Asamblea Legislativa ha declarado “estados de emergencia”. La Expo-sición de Motivos de la Ley de Tierras de Puerto Rico, Ley Núm. 26 de 12 de abril de 1941, según enmendada, consigna para la historia el que la Asamblea Legislativa de Puerto Rico declaró un Estado de Emergencia por razón del desarrollo del latifundio corporativo en el Puerto Rico de aquel entonces. La acción que nuestra Asamblea Legislativa requirió en aquel momento, y en virtud del “estado de emergencia” que había declarado, fue el inmediato rescate de las tierras de manos de aquellas perso-nas jurídicas (corporaciones) que las monopolizaban, y exigiendo la terminación del dominio, posesión o control de las tierras por tales personas. Desde entonces, y en virtud de tales artículos de la Ley de Tierras de Puerto Rico (28 L.P.R.A. sees. 268-273), la Autoridad de Tierras puede expropiar todo terreno perteneciente a una cor-poración con más de 500 acres.
El 27 de noviembre de 1942, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 16, cuyo propósito esencial, tal y como aparece expresado en su título y en la Exposición de Motivos, era: declarar la existencia en Puerto Rico de un estado de emergencia grave ocasionado por la Segunda Guerra Mundial. Esta ley autorizaba programas de trabajos de emergencia, para dar trabajo a los desempleados; autori-zaba proyectos de compensación de desempleo, auxilio, abaratamiento de precios, y siembra y distribución de alimentos, entre otros.
Otro estatuto pre Constitución en el que la Asamblea Legislativa decretó un estado de emergencia lo es la Ley Núm. 464, aprobada el 25 de abril de 1946, cono-cida como Ley de Alquileres Razonables, esto también en el contexto de la Segunda Guerra Mundial.
Asimismo, los Arts. 1 al 6 de la Ley Núm. 3 de 16 de diciembre de 1946 (3 L.P.R.A. sees. 487-492) establecen una serie de medidas que también preceden a la aprobación de nuestra Constitución. Mediante tales artículos el Gobernador, con el consejo y aprobación del “Consejo de Secretarios” puede determinar una emergencia en la prestación de servicios públicos y declara un “estado de emergencia” en un “departamento, dependencia o agencia”. Según el texto de la see. 487 esta declara-ción de emergencia se daría en el contexto del abandono del servicio o amenaza de abandono del servicio, en acción concertada, por parte de un número de funcionarios o empleados, ya sean a sueldo o jornal, de departamentos, dependencias o agencias del Gobierno de Puerto Rico.
Por último, el Art. 48 de la Ley de Bancos, Ley Núm. 55 de 12 de mayo de 1933, según enmendada, 7 L.P.R.A. sec. 204(a), dispone que en caso de “periodos recesio-narios o de depresión que afecten en un alto grado la estructura económica y mone-taria del país con su consabido efecto desfavorable sobre la banca, el Gobernador podrá proclamar un estado de emergencia y tomar las medidas de emergencia con relación a los bancos para la protección del público y los mejores intereses de Puerto Rico”.

8) Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 396 (1973). Véase, además, Aponte v. Srio. de Hacienda, E.L.A., 125 D.P.R. 610, 634 (1990), opinión concurrente del Juez Asociado Señor Negrón García.

 Aponte v. Srio. de Hacienda, E.L.A., supra, pág. 625 esc. 11.

 Exposición de Motivos, Ley Núm. 7 de 9 de marzo de 2009.

 íd.

 íd.

 íd

 íd.

 íd.

 íd.

 íd.

 íd.

 Moody’s y Standard & Poor’s son dos de las tres compañías más importantes en el mundo, dedicadas a la publicación periódica de anlisis financieros que fijan la posición de solvencia de las acciones y los bonos, en sus correspondientes mercados.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd.

 íd

 íd.

 Véase, además, el Art. 33(g) de la Ley Núm. 7, el cual establece que el objetivo de ésta es el establecimiento de un plan de emergencia dirigido a reducir en $2,000 millones los gastos operacionales y de nómina pagaderos del Fondo General para el año fiscal 2009-2010.

 Según estiman los propios recurridos en su alegato, el gobierno se economi-zará $510 millones anuales con los despidos anunciados. Véase Alegato de la parte recurrida, pág. 12.

 Vease Art. 2, Sec. 2.1 de la Ley Núm. 184 (3 L.P.R.A. see. 1461 n.).

 e¡ referido trámite incluiría acciones como: reubicación de personal en pues-tos de igual o similar clasificación en departamentos, oficinas o programas en que haya necesidad de personal; readiestramiento del empleado para reubicarlo en otro puesto, cuando esto pueda hacerse razonablemente antes de la fecha límite para decretar tales cesantías; disfrute de vacaciones acumuladas; licencia sin sueldo hasta tanto cese la crisis presupuestaria, cuando la agencia tome la decisión por la insuficiencia presupuestaria temporera que no requiera la eliminación permanente del puesto. En tales casos, deberá observarse el orden de prelación previamente establecido en el método de decretar cesantías; reducción en la jornada de trabajo y descenso de los empleados como último recurso para evitar cesantías.

 yéase Exposición de Motivos Ley Núm. 7.

 Véase Art. 37.04(b)(3) de la Ley Núm. 7.

 3 L.P.R.A. sec. 1462e(9)(a).

 Véase Art. 37.04(b)(4) de la Ley Núm. 7.

 Véase Art. 37.04(b)(15) de la Ley Núm. 7.

 íd.

 Véase Art. 37.04(b)(9).

 Véase Art. 37.04(b)(ll).

 De hecho, el Art. 46 de la Ley Núm. 7, en atención a que los cesanteados tengan la oportunidad de lograr una solución rápida y justa de sus reclamaciones ante CASARH o la Comisión creada al amparo de la Ley Núm. 45, aumenta el número de miembros a un Presidente y cinco miembros asociados en el caso de CASARH y autoriza al Presidente de la Comisión a nombrar los árbitros que en-tienda necesarios para realizar las labores encomendadas por el Cap. III de la Ley Núm. 7.

 Véase Art. 37.04(b)(8).

 Véase Art. 37.04(b)(9).

 Véase Alegato de la parte recurrida en el CT-2009-4, pág. 27.

 Qon relacjón a ja inmunidad por irretroactividad que ostentan los de-rechos adquiridos y que dispone el Art. 3 del Código Civil, supra, no nos expresare-mos por no ser necesario.

 íd.

 íd.

 Hernández, Romero v. Pol. de P.R., 177 D.P.R. 121, 147 (2009), citando Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101 (2006). Véase, además, Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984).

 Vélez v. Srio. de Justicia, supra.

 Asoc. Maestros v. Depto. Educación, 171 D.P.R. 640, 665 (2007), opinión disidente de la Jueza Asociada Señora Fiol Matta.

 R. Noguera Barreneche, De la no retroactividad de las leyes civiles, 3ra ed., Bogotá, Fondo de Publicaciones Institución Universitaria Sergio Arboleda, 1995, págs. 73-74.

 Píerson Muller I v. Feijoó, supra. Véase, también, Perry v. Sinderman, 408 U.S. 593 (1972); Board of Regents v. Roth, 408 U.S. 564 (1972).

 Lebrón Bonilla v. E.L.A., 155 D.P.R. 475 (2001); Orta v. Padilla Ayala, 131 D.P.R. 227, 241 (1992); Torres Solano v. P.R.T.C., supra.

 Véase Ley Núm. 184 de 3 de agosto de 2004, según emendada.

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296.

 Serrano Geyls, op. cit, pág. 1082.

 íd.

 López v. E.L.A., 165 D.P.R. 280, 297 (2005).

 íd.

 Alicea v. Córdova, 117 D.P.R. 676, 696 (1986); Pueblo v. Matías Castro, 90 D.P.R. 528, 531 (1964).

 Zachry International v. Tribunal Superior, supra, pág. 277.

 Vda. de Miranda v. Srio. de Hacienda, 114 D.P.R. 11, 14 (1983).

 Serrano Geyls, op. cit, pág. 1081.

 íd.

 López v. E.L.A., supra, pág. 298; Vélez v. Srio. de Justicia, supra, pág. 537; León Rosario v. Torres, 109 D.P.R. 804, 813 (1980).

 Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562, 582 (1992).

 San Miguel Lorenzana v. E.L.A., supra, págs. 431-432.

 íd., pág. 432.

 íd.

 Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71, 83 (1988).

 San Miguel Lorenzana v. E.L.A., supra, pág. 433.

 Alvarez González, op. cit., pág. 826.

 Defendini Collazo et al. v. E.L.A., supra, pág. 61; Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.

 San Miguel Lorenzana v. E.L.A., supra, pág. 425.

 Soto v. Adm. Inst. Juveniles, 148 D.P.R. 810, 831 (1999); San Miguel Lorenzana v. E.L.A., supra, pág. 425; Berberena v. Echegoyen, supra, pág. 879.

 Calo Morales v. Cartagena Calo, 129 D.P.R. 102, 133 (1991). Véase, además, Serrano Geyls, op. cit., pág. 1086.

 Véase, además, In re Colton Fontán I, 154 D.P.R. 466, 472-473 (2001).

 Véase J.J. Álvarez, Derecho Constitucional, 74 (Núm. 3) Rev. Jur. U.P.R. 597, 615 (2005).

 Serrano Geyls, op. cit, pág. 1192.

 Véase, además, Álvarez González, op. cit., pág. 935.

 id.

 Cabe señalar que en Vélez v. Srio. de Justicia, supra, pág. 538, este Tribunal reconoció el valor intrínseco de la Exposición de Motivos de una ley a la hora de determinar el interés del Estado bajo el análisis de la igual protección de las leyes.

 Debemos señalar que el Art. 37.02 de la Ley Núm. 7, supra, establece ciertas exclusiones en su aplicación con el fin de evitar un impacto negativo en los servicios que brinda el Gobierno.

 Véanse la Ley Núm. 147 de 18 de junio de 1980, según enmendada, 23 L.P.R.A. see. 104 y la Ley Núm. 258 de 30 de julio de 1974, según enmendada, 2 L.P.R.A. see. 553.

 Véase Watkins v. New York State Ethics Com., 554 N.Y.S.2d 955, 965 (1990).

 Los recurridos en el CT-2009-06 alegan que la implantación de la Ley Núm. 7 les viola sus derechos constitucionales porque establece un patrón de discrimen por razón de ideas políticas, así como por razón de edad y de sexo. Sin embargo, consi-derando, como hemos resuelto, que la Ley Núm. 7 utiliza como criterio para los despidos únicamente el de antigüedad, entendemos que tales alegaciones carecen totalmente de méritos. No obstante, si en la interpretación o implementación de ese criterio único de antigüedad existiera por parte de la agencia concernida algún dis-crimen que pudiera catalogarse dentro de las clasificaciones alegadas, es materia de prueba que en su día deberá ser aquilatada por un Tribunal de Primera Instancia.

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

 Art. 1, Sec. 10, Const. E.E. U.U., L.P.R.A., Tomo 1. Véase, además, United States Trust Co. v. New Jersey, 431 U.S. 1 (1977).

 Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987).

 Energy Reserves Group v. Kansas Power & Light, 459 U.S. 400 (1983); United States Trust Co. v. New Jersey, supra.

 Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra, pág. 17.

 Véase Warner Lambert Co. v. Tribunal Superior, supra. Véase, además: General Motors Corp. v. Romein, 503 U.S. 181, 187 (1992); Energy Reserves Group v. *81 Kansas Power & Light, supra, pág. 411.

 Warner Lambert Co. v. Tribunal Superior, supra; General Motors Corp. v. Romein, supra; Nowak and Rotunda Constitutional Law, Sec. 11.8, págs. 416-417 (1995).

 Warner Lambert Co. v. Tribunal Superior, supra.

 Id. Véase Home Bldg. & L. Assn. v. Blaisdell, 290 U.S. 398 (1934).

 Bayrón Toro v. Serra, supra.

 Warner Lambert Co. v. Tribunal Superior, supra, pág. 394; Bayrón Toro v. Serra, supra. Véanse, además: Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978); R. Epstein, Toward a Revitalization of the Contract Clause, 51 (Núm. 3) U. Chi. L. Rev. 703, 717 (1984).

 Warner Lambert Co. v. Tribunal Superior, supra.

 Local Div. 589, etc. v. Comm. of Mass., 666 F.2d 618, 639 (1er Cir. 1981). Véanse, además: Buffalo Teachers Federation v. Tobe, 464 F.3d. 362, 367 (2do Cir. 2006); Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore, 6 F.3d. 1012, 1018 (4to Cir. 1993).

 Allied Structural Steel Co. v. Spannaus, supra, págs. 245-246; El Paso v. Simmons, 379 U.S. 497 (1965).

 Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore, supra, pág. 1017.

 Buffalo Teachers Federation v. Tobe, supra, pág. 368.

 Bayrón Toro v. Serra, supra; United States Trust Co. v. New Jersey, supra.

 Bayrón Toro v. Serra, supra.

 United States Trust Co. v. New Jersey, supra, págs. 29-31.

 Home Bldg. & L. Assn. v. Blaisdell, supra, pág. 447.

 Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore, supra, págs. 1023-1026.

 Véase Alegato de la parte recurrida, págs. 4-5.

 Véase Apéndice, Convenio Colectivo, pág. 30.

 Bayrón Toro v. Serra, supra; United States Trust Co. v. New Jersey, supra.

 Buffalo Teachers Federation v. Tobe, supra.

 Véase Art. I, See. 2, Const. E.L.A., L.P.R.A., Tomo 1.

 Colón Cortés v. Pesquera, 150 D.RR. 724, 752 (2000).

 Pueblo v. Santiago Feliciano, 139 D.P.R. 361, 420 (1995).

 Santana v. Gobernadora, 165 D.P.R. 28, 45 (2005).

 Colón Cortés v. Pesquera, supra; Sinking-Fund Cases, 99 U.S. 700, 718 (1878).

 Santana v. Gobernadora, supra, págs. 45-46; Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982).

 D. Fernández Quiñones, Derecho administrativo y ley de procedimiento administrativo uniforme, 2da ed., Bogotá, Ed. Forum, 2001, Sec. 2.2, pág. 35.

 íd.

 Véase Field v. Clark, 143 U.S. 649, 692 (1892).

 J.A. Echevarría Vargas, Derecho Administrativo Puertorriqueño, Ira ed. revisada, San Juan, Ed. Situm, 2009, pág. 8.

 íd., pág. 9.

 íd.

 Rodríguez v. Bco. Gub. de Fom. P.R., 151 D.P.R. 383, 400 (2000).

 Viajes Gallardo v. Clavell, 131 D.P.R. 275 (1992); M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987); Hernández Montero v. Cuevas, 88 D.P.R. 785 (1963); López v. Junta Planificación, 80 D.P.R. 646 (1958); Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670 (1953); Luce & Co. v. Junta de Salario Mínimo, 62 D.P.R. 452 (1944).

 Fernández Quiñones, op. cit., See. 2.3, pág. 48.

 Hilton Hotels v. Junta Salario Mínimo, supra, págs. 692-693.

 Debién v. Junta de Contabilidad, 76 D.P.R. 96, 104 (1954).

 Art. 33(f) de la Ley Núm. 7, supra.

 íd.

 Véase Art. IV, Seo. 4, Const. E.L.A., L.P.R.A., Tomo 1.

 Véanse Arts. 33(g), 37.04(b)(1).

 ViajeS Gallardo v. Clavell, supra, págs. 284 — 286.

 Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, págs. 403-404.

 Op. Sec. Just. Núm. 5 de 1985.

 Op. Sec. Just. Núm. 24 de 1986; Op. Sec. Just. Núm. 31 de 1984.

 4 Diario de Sesiones 2606 (1961).

 Santana v. Gobernadora, supra, pág. 47.

 Art. 68 de la Ley Núm. 7, supra.

 Abella v. Fernández et al., 17 D.P.R. 1063 (1911).